828 A.2d 883

DORIS GREEN, PLAINTIFF–RESPONDENT, v. JERSEY CITY BOARD OF EDUCATION, A BODY CORPORATE AND POLITIC, DEFENDANT–APPELLANT, AND CASSANDRA WIGGINS, INDIVIDUALLY, SHERYL SULLIVAN, INDIVIDUALLY AND FRANK PICCILLO, INDIVIDUALLY, DEFENDANTS.

Argued January 6, 2003—Decided August 11, 2003.

436

*Howard B. Mankoff* argued the cause for appellant (*Marshall, Dennehey, Warner, Coleman & Goggin,* attorneys).

*Alan L. Krumholz* argued the cause for respondent.

*Jon W. Green* argued the cause for amicus curiae, National Employment Lawyers Association of New Jersey (*Green, Lucas, Savits, & Marose,* attorneys; *Mr. Green* and *Glen D. Savits,* on the briefs).

*Patrick DeAlmeida,* Deputy Attorney General, submitted a brief on behalf of amicus curiae, Attorney General of New Jersey (*David Samson,* Attorney General, attorney; *Karen L. Jordan,* Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

PORITZ, C.J.

█ In this case, the Court confronts once again the question whether the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8, permits an award of punitive damages against a public entity. *See Abbamont v. Piscataway Bd. of Educ.,* 138 *N.J.* 405, 650 *A.*2d 958 (1994) (*Abbamont* I), *appeal after remand,* 314 *N.J.Super.* 293, 714 *A.*2d 958 (App.Div.1998), *aff'd,* 163 *N.J.* 14, 746 *A.*2d 997 (1999). We hold today that punitive damages may be awarded under CEPA against public entity defendants in appropriate cases. We also hold that the CEPA one-year statute of limitations, *N.J.S.A.* 34:19–5, begins to

run from the final act of retaliation when there is a continued course of retaliatory conduct by the employer.

# I

Plaintiff Doris Green was a science teacher in the Jersey City Public School system for the thirty-year period from 1967 to 1997. In 1994, she sought and obtained an assignment to Public School 22 because of the teacher programs offered there. At Public School 22, Green participated in training seminars and other non-classroom activities, including workshops in mediating student disputes and increasing student interest in scholarships. She also attended a summer teachers' program at the Stevens Institute of Technology in Hoboken (Stevens Institute), for which she received no compensation but which resulted in a $1,000 grant of computers and materials to her classroom.

According to plaintiff, she was asked in May of 1995 by her supervisor and principal, Cassandra Wiggins, to expect receipt of a check for more than $500 on behalf of another employee. Wiggins explained to Green that the other teacher had supervised an after-school program for which he did not have adequate credentials. Wiggins had submitted Green's name and credentials to the District and was asking Green to give the money to Wiggins when she received the check so that Wiggins could, in turn, ensure that the other teacher was compensated. Green refused to participate in this scheme because she believed it to be fraudulent or illegal. After informing Wiggins that she did not wish to receive the money on her colleague's behalf, Green left Wiggins's office presuming that the matter was closed.

Two months later, however, Green received a check for $543.63 that she deposited in her bank account believing it to be payment for her participation in a mediation program. It was not until Wiggins telephoned Green at home in July asking whether Green had received the check and demanding payment that Green realized the check she had deposited was not money she had earned. After the telephone call from Wiggins, Green brought the matter

to the attention of the Vice Principal of Public School 22, and then to Lorraine Casey Church, the payroll supervisor for the Jersey City Board of Education. Green told Church that she wanted to return the money. Church advised Green to have Wiggins call her and to send a check to the Board enclosing a letter that explained the situation.

Green followed Church's instructions and mailed a check to the Board for $543.63 with a letter explaining that she had not participated in the program for which she had been compensated. Green also requested that her name be removed from any list naming her as a participant in that program. Subsequently, Church returned the check to Green with a note informing her that Wiggins had authorized Green's receipt of a portion of the money and that the difference would be taken out of Green's next paycheck. Green kept the remainder of the money, again believing that it was for the mediation program. (By the time of trial, however, Green had become convinced that she was not entitled to any portion of the money.)

When the school year started the following September, Wiggins informed Green that she was very angry with her for reporting the incident to Church, and that Green would no longer be able to participate in the Stevens Institute program or the student mediation program. Green was told that she was on Wiggins's "shit list" and that any requests Green made for additional programs or training would be denied. A host of other retaliatory acts followed: Green was given substandard evaluations even though her previous evaluations had been consistently satisfactory; she was moved to a dilapidated classroom with inadequate furniture; she had trouble getting necessary supplies; she was denied a key to the science lab; and her requests for photocopying services were repeatedly rejected. In addition, Green's class was treated unfairly, i.e., her students were no longer allowed to participate in opening exercises or in an honor roll ceremony, or permitted to go on field trips. These incidents continued throughout two school years, from September 1995 through the spring of 1997.

In May 1997, Green left her teaching position and went on medical leave as a result of persistent severe headaches and other physical symptoms she had been suffering since November 1996. Her psychiatrist has diagnosed her with a major depressive disorder, finding a causal relationship between her work situation and her illness. She has never returned to teaching.

## II

On May 14, 1997, Green filed suit against the Jersey City Board of Education and several individual defendants, including Cassandra Wiggins, alleging that defendants had engaged in "continuous and increased forms of harassment" dating back to July 23, 1995. She contended that defendants' behavior caused her loss of employment due to stress-related illness and that their harassing conduct amounted to a violation of her rights under CEPA. Defendants countered that plaintiff's claim was barred by the Tort Claims Act (TCA), *N.J.S.A.* 59:9–2c, and by the one-year statute of limitations of CEPA.

The case was tried before a jury in February 2000. After both sides had concluded, but before the jury rendered a verdict, the trial judge dismissed both individual defendants and plaintiff's common law claims. On the CEPA claim, however, the jury returned a verdict against the Jersey City School Board, awarding plaintiff $265,000 in compensatory damages and $300,000 in punitive damages.[1]

On appeal, defendant argued, among other things, that the TCA bars the imposition of punitive damages in CEPA claims; that the punitive damages award was excessive; and that prejudgment interest is not allowable on punitive damages. In an unpublished opinion, the Appellate Division affirmed the jury verdict, but

---

[1] The trial judge imposed prejudgment interest of $33,097.38 for the compensatory damages award and $37,468.75 for the punitive damages award. Defendants were ordered to pay $89,056.23 in counsel fees and $8,651.47 in reimbursement expenses.

reversed the trial judge's imposition of prejudgment interest on punitive damages. In respect of the punitive damages award, the court held "that the present state of our law is that punitive damages are available against public entities under CEPA." In so holding, the Appellate Division focused on our decisions in *Abbamont* I and in *Cavuoti v. New Jersey Transit Corporation*, 161 *N.J.* 107, 735 *A.*2d 548 (1999).

The Jersey City Board of Education petitioned for certification to the Court on two issues: whether punitive damages may be awarded against a public entity under CEPA, and whether Green's claim was barred by CEPA's one-year statute of limitations. We granted certification on June 12, 2002. 174 *N.J.* 41, 803 *A.*2d 636.

### III

We begin with the question of punitive damages under CEPA. After this Court's ruling in *Pierce v. Ortho Pharmaceutical Corporation*, 84 *N.J.* 58, 417 *A.*2d 505 (1980), the Legislature enacted CEPA to "protect employees who report illegal or unethical work-place activities."[2] *Barratt v. Cushman & Wakefield of N.J., Inc.*, 144 *N.J.* 120, 127, 675 *A.*2d 1094, 1098 (1996). To effectuate that purpose, the statute prohibits an employer from:

tak[ing] any retaliatory action against an employee because the employee . . .:

a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer ... that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to a law

. . .

c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . .;

---

[2] In *Pierce,* the Court held that, at common law, "[a]n employer's right to discharge an employee at will carries a correlative duty not to discharge an employee who declines to perform an act that would require a violation of a clear mandate of public policy." *Pierce, supra,* 84 *N.J.* at 72, 417 *A.*2d at 512.

(2) is fraudulent or criminal; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

[*N.J.S.A.* 34:19-3.]

In pertinent part, *N.J.S.A.* 34:19-2a defines "employer" expansively to include, *inter alia,* "all branches of State Government, or the several counties and municipalities thereof, or any other political subdivision of the State, or a school district, or any special district, or any authority, commission, or board or any other agency or instrumentality thereof." Further, CEPA includes a broad provision directing that "[a]ll remedies available in common law tort actions shall be available to prevailing plaintiffs ... in addition to any legal or equitable relief provided by this act or any other statute," and specifically permitting the court to order "[p]unitive damages." *N.J.S.A.* 34:19-5. Those provisions, together, are the key to the first question raised herein: whether punitive damages are available in a CEPA action brought against a public body.

■ In *Abbamont* I, *supra,* this Court was evenly divided on that question.[3] 138 *N.J.* at 433, 650 *A.*2d at 971–72. The justices concurring in the judgment of the Appellate Division reasoned that the express provision in *N.J.S.A.* 34:19–5f by which punitive damages are available to CEPA claimants in appropriate cases, coupled with the Legislature's failure to provide governmental immunity either under CEPA or by reference to the TCA, *N.J.S.A.* 59:9–2c, evidenced the Legislature's intent to allow punitive damages against public entities in CEPA actions. *Id.* at 426–28, 650 *A.*2d at 968–69. Justice Handler explained that the omission of a provision in CEPA specifically excluding "punitive damages against public employers ... must be deemed purposeful" because the Legislature easily could have exempted govern-

---

[3] A three-three decision by this Court does not carry precedential weight, although the opinion of the three justices affirming the court below becomes the controlling law for subsequent judicial proceedings in that case. *Abbamont* II, *supra,* 163 *N.J.* at 14, 746 *A.*2d at 997; *id.* at 15, 746 *A.*2d at 997 (Verniero, J., concurring); *Anderson v. Somberg,* 158 *N.J.Super.* 384, 390–91, 386 *A.*2d 413, 416–17 (App.Div.), *certif. denied,* 77 *N.J.* 509, 391 *A.*2d 522 (1978).

ment entities from CEPA's punitive damages provision had it wished to do so. *Id.* at 426–27, 650 *A.*2d at 968–69. Rather, CEPA defines employers to include governmental entities and does not then expressly exclude them from the imposition of punitive damages. When another statute clearly establishes a remedy and does not limit the application of that remedy, as in the case of CEPA, the general immunity of the TCA must fall. *Ibid.*[4]

The three justices also compared CEPA to the Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –49, finding support for punitive damages against public sector defendants in the unique legislative purpose of the two statutes. Justice Handler noted that:

> [t]he purpose of CEPA, like that of LAD, is different from that of TCA. The whistleblower statute, like LAD, is a civil rights statute. Its purpose is to protect and encourage employees to report illegal and unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.
> [*Id.* at 431, 650 *A.*2d at 971.]

Most important, in response to concerns regarding an award of punitive damages against public entities, Justice Handler turned to the "heightened standard [the Court] ha[d] adopted for imposing ... damages against [such] entities," *id.* at 429, 650 *A.*2d at 970, stating:

---

[4] We recognize that the majority of states bars the imposition of punitive damages against public entities either by statute or judicial decision. *See, e.g., Ariz.Rev.Stat.* § 41–621K (West 2003) (immunizing public entities from liability for punitive damages); *Cal. Gov't Code* § 818 (West 1995) (same); *Metro. Atlanta Rapid Auth. v. Boswell,* 261 *Ga.* 427, 405 *S.E.*2d 869, 870 (1991) (holding that the imposition of punitive damages against public entities violates public policy and "therefore is impermissible as a matter of law"); *Sharapata v. Town of Islip,* 56 *N.Y.*2d 332, 452 *N.Y.S.*2d 347, 437 *N.E.*2d 1104, 1105–07 (1982) (holding that state and political subdivisions are not subject to punitive damages). In Connecticut, however, punitive damages may be imposed against public entities for " 'a reckless indifference to ... or an intentional and wanton violation of th[e] rights' " of others. *Kenny v. Civil Serv. Comm'n,* 197 *Conn.* 270, 496 *A.*2d 956, 960 (1985) (quoting *Vandersluis v. Weil,* 176 *Conn.* 353, 407 *A.*2d 982, 986 (1978)). Massachusetts has interpreted certain enactments to allow for punitive damages against public entities. *See, e.g., Bain v. City of Springfield,* 424 *Mass.* 758, 678 *N.E.*2d 155, 159–60 (1997) (holding that state anti-discrimination statute specifically subjects public entities to punitive damages).

> Under [the *Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 624–25, 626 *A.*2d 445, 464–65 (1993)] heightened standard for liability, punitive damages may be awarded only if the conduct of managerial or supervisory government officials is particularly egregious and involves willful indifference or actual participation. Based on that kind of misuse of governmental authority, punitive damages serve to effectuate the goals of a statute that is specifically designed to discourage and eradicate vindictive action by employers and to further important interests of both employees and the public.
>
> [*Ibid.*]

In *Lockley v. Department of Corrections,* 177 *N.J.* 413, 828 *A.*2d 869, 2003 *WL* 21878377 (2003), also decided today, we emphasized the importance of that heightened standard when considering whether an award of punitive damages is warranted in the first instance. We repeated our earlier determination that, as in the private sector, a public entity may be held " 'liable for punitive damages ... only in the event of actual participation by upper management or willful indifference.' " *Id.* at 424, 828 *A.*2d at 876 (quoting *Cavuoti, supra,* 161 *N.J.* at 117, 735 *A.*2d at 554 (internal citation omitted)). Specifically, we reaffirmed our direction in *Cavuoti, supra,* which required a searching inquiry into both the status and roles of persons claimed to be upper management, *id.* at 424–25, 828 *A.*2d at 876–77 (citation omitted), and we set rigorous standards for the calculation of punitive damages against a public entity, recognizing that "public monies are the source of the award," *id.* at 432–33, 828 *A.*2d at 882. We trust that our courts will be vigilant in their review of such awards and that public entities will not, as the dissent suggests, be "at risk of being treated more harshly than" other defendants. *See post* at 450, 828 *A.*2d at 893.

One final consideration in respect of an award of punitive damages against a public body deserves mention. When this Court decided *Abbamont* I, *supra,* in 1994, Justice Pollock, in dissent, expressed reservations about the intent of the Legislature in respect of punitive damages under CEPA. He noted that the "legislative history and language" of the Act "left ample room for reasonable judges to disagree," and called upon the Legislature to

correct the Court if it had misread the legislative intent. *Abbamont* I, *supra,* 138 *N.J.* at 436, 650 *A.*2d at 973 (Pollock, J., concurring and dissenting). He urged "the Legislature to revisit the issue and resolve it definitively." *Ibid.*

Five years later, in *Cavuoti, supra,* when the Court relied on *Abbamont* I in holding that punitive damages were available against public entities in LAD cases, we stated:

> We are sustained in that conclusion by the Legislature's five-year acquiescence in the *Abbamont* interpretation of CEPA. There is ample precedent in New Jersey to support the proposition that, when a statute has been judicially construed, the failure of the Legislature subsequently to act is evidence of legislative acquiescence in the construction given to the statute.
>
> [*Cavuoti, supra,* 161 *N.J.* at 133, 735 *A.*2d at 564.]

That same year, four months later, Justice Verniero again asked the Legislature to consider the question, restating Justice Pollock's conclusion that " '[t]he best solution would be for the Legislature to revisit the issue and resolve it definitively.' " *Abbamont* II, *supra,* 163 *N.J.* at 15, 746 *A.*2d at 997 (quoting *Abbamont* I, *supra,* 138 *N.J.* at 436, 650 *A.*2d at 973 (Pollock, J., concurring and dissenting)).

For nine years the Court repeatedly has requested that the Legislature take up the issue of punitive damages against public entities if it deems our interpretation to have been mistaken. The Legislature has not acted. We can only assume from that silence that it intended to subject public entities to punitive damages under CEPA. *See Lemke v. Bailey,* 41 *N.J.* 295, 301, 196 *A.*2d 523, 526 (1963) ("The construction of a statute by the courts, supported ... by continued use of the same language or failure to amend the statute, is evidence that such construction is in accordance with legislative intent ...."); *accord Cavuoti, supra,* 161 *N.J.* at 133, 735 *A.*2d at 563 ("There is ample precedent to support the proposition that, when a statute has been judicially construed, the failure of the Legislature subsequently to act is evidence of legislative acquiescence in the construction given to the statute.") (collecting cases); *Matter of Mun. Election Held on May 10, 1994,* 139 *N.J.* 553, 559, 656 *A.*2d 5, 8 (1995) ("Legislative acquiescence

in the interpretation of a statute ... provides some assurance that our interpretation comports with the intent of the Legislature."); *Egan v. Erie R.R. Co.,* 29 *N.J.* 243, 250, 148 *A.*2d 830, 833–34 (1959) (stating that Legislature's failure to respond to court's interpretation of statute is evidence that such interpretation accords with legislative intent).

## IV

█ The Jersey City Board of Education also asserts that Green's lawsuit is barred by CEPA's one-year statute of limitations.

CEPA defines actionable retaliation as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." *N.J.S.A.* 34:19–2e. The statute further states that "[u]pon a violation of any of the provisions of this act, an aggrieved employee or former employee may, within one year, institute a civil action in a court of competent jurisdiction." *N.J.S.A.* 34:19–5. The Jersey City Board of Education argues that because Green's complaint was filed on May 14, 1997, and the retaliatory conduct that she alleges began in September 1995, her lawsuit is barred by the one-year statute of limitations. We do not agree.

In *Wilson v. Wal–Mart Stores,* 158 *N.J.* 263, 272, 729 *A.*2d 1006, 1010 (1999), a case brought under the LAD, we held that "[w]hen an individual is subject to a continual, cumulative pattern of tortious conduct, the statute of limitations does not begin to run until the wrongful action ceases." More recently, we applied the "analytical framework" found in *National Railroad Passenger Corporation v. Morgan,* 536 *U.S.* 101, 122 *S.Ct.* 2061, 153 *L.Ed.*2d 106 (2002), in another LAD case that focused on the continuing violation doctrine and the LAD statute of limitations. *Shepherd v. Hunterdon Developmental Ctr.,* 174 *N.J.* 1, 803 *A.*2d 611 (2002). Although acknowledging that "in resolving disputes under our State employment-law jurisprudence, federal case law is merely a guide," we found the formulation set forth by the United States

Supreme Court to be persuasive. *Id.* at 20, 803 *A.2d* at 623. That Court "explained the distinction between a hostile work environment claim [that would fall within the continuous tort doctrine] and a claim based on a discrete act [that would not]," as follows:

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative [e]ffect of individual acts.
>
> . . .
>
> In determining whether an actionable hostile work environment claim exists, we look to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." . . . A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice." . . . It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.
>
> That act need not, however, be the last act. As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has "occurred," even if it is still occurring. Subsequent events, however, may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole.
>
> [*Id.* at 19–20, 803 *A.2d* at 622–23 (quoting *Morgan, supra,* 536 *U.S.* at 115–17, 122 *S.Ct.* at 2073–74, 153 *L.Ed.2d* at 123–25 (citations and footnotes omitted)) ].

■ This Court adopted *Morgan's* schema for determining when a cause of action arising under the LAD would be considered a "continuing violation." *Id.* at 21, 803 A.2d at 623. Most relevant here, we required an inquiry into whether the "plaintiff[ ][had] alleged a pattern or series of acts, any one of which may not be actionable as a discrete act, but when viewed cumulatively constitute a hostile work environment[.]" *Ibid.* If the answer to that question is "yes" then "[plaintiff's] cause of action accrued on the date on which the last act occurred, notwithstanding 'that some of the component acts of the hostile environment [were] outside the statutory time period.' " *Ibid.*

The policy concerns underpinning the determination in *Shepherd* in respect of LAD claims require the application of the *Morgan/Shepherd* framework in CEPA actions. "Retaliation," as defined by CEPA, need not be a single discrete action. Indeed, "adverse employment action taken against an employee in the terms and conditions of employment," *N.J.S.A.* 34:19–2e, can include, as it did in this case, many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct. As Justice Handler said in *Abbamont* I, *supra*, CEPA,

> like LAD, is a civil rights statute. Its purpose is to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct. Consistent with that purpose, CEPA must be considered "remedial" legislation and therefore should be construed liberally to effectuate its important social goal.
>
> . . .
>
> "In New Jersey, we are deeply committed to the principle that an employer's right to discharge an employee carries a correlative duty to protect his freedom to decline to perform an act that would constitute a violation of a clear mandate of public policy."
>
> [138 *N.J.* at 431–32, 650 *A.*2d at 971 (citations omitted).]

## V

We hold that because the acts of retaliation against plaintiff continued until she resigned her teaching position in May 1997, and because plaintiff filed her lawsuit on May 14, 1997, CEPA's one-year statute of limitations does not bar her claim. We hold further that punitive damages in this case were properly awarded under CEPA, and that the amount awarded is not disproportionate to the harm suffered by plaintiff.

The judgment of the Appellate Division is affirmed.

VERNIERO, LaVECCHIA, and ALBIN, JJ., dissenting.

The majority holds that the Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –9 (CEPA), permits an award of punitive damages against a public entity, in this case an *Abbott* school

district serving poor school children. The decision to allow punitive damages in this setting is not necessary to make the victim whole, for that has been accomplished by the award of compensatory damages and counsel fees. The decision, however, will result in taking scarce resources from needy students. In our view, allowing punitive damages against a public entity is so far contrary to the interests of the public, we would have expected the Legislature to speak clearly and unambiguously if it intended such a declaration against the people's self-interest, as was pointed out in the well-reasoned opinion of Justice Pollock in *Abbamont v. Piscataway Board of Education*, 138 *N.J.* 405, 435–36, 650 *A.*2d 958, 973 (1994) (Pollock, J., concurring and dissenting).

We believe that sovereign immunity is the baseline, as did the dissent in *Abbamont*. When the Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3(TCA), reasserted the State's sovereign immunity (except where the TCA allowed suit to be brought), it specifically reaffirmed the common law that punitive damages are not available against the State. *N.J.S.A.* 9:9–2(c). In our view, the State's presumptive immunity from punitive damage awards can be breached only by a clear and unmistakable expression by the Legislature. The CEPA does not contain that unambiguous pronouncement. Nowhere in the Act or its history is there an expression of legislative intent to alter the decades of law that prohibited punitive damages against public entities.

The Court applies an abbreviated version of the Punitive Damages Act, *N.J.S.A.* 2A:15–5.9 to –5.17(PDA), as the standard for an award of punitive damages against a public entity. That the Legislature did not contemplate the use of the PDA for punitive damage awards against public entities is clear from the language of the Act. The PDA was premised on a private sector, profit-oriented model and, therefore, was not intended to apply to public entities. In today's companion case of *Lockley v. Department of Corrections*, 177 *N.J.* 413, 430–31, 828 *A.*2d 869, 880–81, 2003 WL 21878377 (2003), the Court recognizes the illogic of having a jury determine how much of the state budget (or, as here, that of a

political subdivision) can or should be considered when fashioning a punitive damage award, and removes from the jury's consideration the financial impact on the taxpayers. However, taking away an additional limitation on the size of punitive damage awards, places public entities at risk of being treated more harshly than private sector entities, or even individuals.

Consideration of the financial ability of a private person or entity was one means of keeping within check a runaway punitive damages award in those cases where there were limited resources to tap. The absence of that factor in the calculation of punitive damages in public entity cases may lead a jury naturally to assume that a public entity has the wherewithal through its power of taxation to pay almost any award. It seems incongruent that the Legislature would have taken such care to establish limiting principles for the award of punitive damages as against the private sector, but have provided no guidance on how such awards should be imposed on public entities.

The problem with punitive damages against public entities is that it is unworkable and inflicts punishment not on the wrongdoer but on the innocent taxpayer. Moreover, if upper level managers are not deterred by the prospect of punitive damages being awarded against them personally, they are unlikely to be deterred by the threat of a punitive damages award against the public entity for which they work. Indeed, there already is great deterrent value in having a public entity pay a compensatory damages award and counsel fees. To transfer the penalty of punitive damages to the innocent taxpayer does not advance any salutary purpose. *City of Newport v. Fact Concerts, Inc.*, 453 *U.S.* 247, 272, 101 *S.Ct.* 2748, 2762, 69 *L.Ed.*2d 616, 635 (1981) (holding "that considerations of history and policy do not support exposing a municipality to punitive damages for the bad-faith actions of its officials" in § 1983 federal civil rights cases).

If the majority has interpreted the CEPA mistakenly to permit punitive damages against public entities, the Legislature is not

without a remedy. Whether permitting punitive damage awards against public entities is good public policy is ultimately the decision of our elected representatives. Their silence or action will be conclusive on the issue.

We respectfully dissent.

*For affirmance*—Chief Justice PORITZ, and Justices COLEMAN, LONG and ZAZZALI—4.

*Dissenting*—Justices VERNIERO, LaVECCHIA, and ALBIN—3.