874 A.2d 580

JOSEPH POTENTE, PLAINTIFF–RESPONDENT, v. COUNTY OF HUDSON, DEFENDANT–APPELLANT, AND CARMEN MESSANO, AS PROSECUTOR OF HUDSON COUNTY AND ROBERT B. MARTIN, AS CHIEF OF INVESTIGATIONS OF THE HUDSON COUNTY PROSECUTOR'S OFFICE, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Submitted September 13, 2004—Decided June 3, 2005.

Before Judges A.A. RODRÍGUEZ, CUFF and WEISSBARD.

*Donato J. Battista,* Hudson County Counsel, attorney for appellant (*Michael L. Dermody,* First Assistant County Counsel, on the brief).

*Cohen, Leder, Montalbano & Grossman,* attorneys for respondent (*Brian E. Curtis,* on the brief).

The opinion of the court was delivered by:

A.A. RODRÍGUEZ, P.J.A.D.

One of the issues presented in this appeal is whether a successful claimant is entitled to prejudgment interest, as authorized by *Rule* 4:42–11(b), in an action pursuant to the Law Against Discrimination (LAD)[1] against a public entity employer. We hold that such claimant is entitled to prejudgment interest.

---

[1] *N.J.S.A.* 10:5–1 to –49.

## I

Plaintiff Joseph Potente had been a long-term employee of the County of Hudson when his employment was terminated on December 7, 1994. He had served as an investigator in the Hudson County Prosecutor's Office since 1982. In December 1993, Potente was involved in a work-related auto accident, resulting in injuries to his shoulder. He claimed and received workers' compensation benefits. The County designated Teofilo A. Dauhajre, M.D., as Potente's treating physician pursuant to *N.J.S.A.* 34:15–15. Potente's medical treatment was monitored by the County's workers' compensation administrator, Scibal Insurance Group.

In May 1994, Potente returned to work part-time, performing light office work for six hours per day and spending two hours per day in physical therapy. However, by September 1994, his shoulder pain had worsened and required surgery. Potente did not reapply for workers' compensation benefits at that time. Instead, he utilized vacation, sick and compensatory time in order to receive pay while out of work.

Eventually, Potente exhausted these options and requested a leave of absence. Lieutenant James Hoppes, Potente's direct supervisor, denied the request. Hoppes wrote as follows:

With respect to this request I have been instructed to inform you that a more detailed account of your injuries and subsequent treatment will be needed. To this end, I am instructing you to reply in writing whether the injuries that predicated the surgery performed on September 20, 1994 and the subsequent therapy were a direct result of the motor vehicle accident you were involved in on December 28, 1993 or whether these injuries were sustained as a result of other actions. Your reply to this directive should be .... submitted no later than Monday November 28, 1994 by the end of the business day.

Potente sent the following reply:

I do not possess the requisite medical expertise to causally relate my shoulder injury to my December 28, 1993 motor vehicle accident. For further clarification of this issue, I suggest you contact my treating doctor: Dr. Teofilo A. Dauhajre, [address and telephone].

The only information I can give you is that prior to my December 28, 1993 accident, I never had any physical problems with my right shoulder. It was not

until immediately after this accident that I first began to experience any pain or problems with my right shoulder.

Finally, from the date of the accident until this date, I did not suffer any other trauma to my right shoulder area.

On November 29, 1994, Chief of Investigators Robert B. Martin ordered Potente to return to work, effective November 30, 1994. Martin's letter stated in its entirety:

Please be advised that your request dated November 22, 1994 for an unspecified leave of absence has been denied. As such, you are directed to report to work on Wednesday, November 30, 1994 at 0900 hours.

If you choose not to report to work, you have the option to resigning your position with this office.

Failure to comply with this directive will result in disciplinary action.

Instead of reporting to work, Potente requested a "family leave of absence." Martin denied this request and reiterated the directive to report to work, effective immediately.

Potente then applied for state disability benefits. At the time, Dr. Dauhajre was of the opinion that Potente was "totally incapacitated," and that this status would continue until December 15, 1994. Despite this medical opinion from the treating physician selected by the County, on December 7, 1994, Chief Martin terminated Potente's employment due to his absence without leave or permission. The same day, Potente reapplied for workers' compensation benefits. The claim included a statement by Dr. Dauhajre, opining that Potente would not be able to return to work until January 23, 1995. Dr. Dauhajre approved Potente's return to work on January 23, 1995. However, the County would not accept Potente's services based on the December 7, 1994 termination.

## II

Potente filed suit against the County, the Prosecutor at the time, Carmen Messano, and Chief Martin.[2] The complaint alleged

---

[2] Potente withdrew his claim against Messano. The claim against Martin was dismissed by the judge at the close of all the evidence.

wrongful termination contrary to the LAD, as well as a "violat[ion][of] the doctrine of basic fairness and administrative due process." Potente asserted that as a result of his injuries, he was "handicapped" as defined by the LAD.

At trial, in addition to Potente's testimony, the jury observed the videotaped testimony of Dr. Dauhajre. According to Dr. Dauhajre, Potente suffered from a disability caused by bodily injury to his shoulder while in the course of employment. Dr. Dauhajre testified that Potente was "totally incapacitated" as a result of the injury and could not return to work until December 15, 1994, which he later extended to January 23, 1995. Several notes admitted into evidence corroborated this opinion. Therefore, due to medical reasons, Potente was unable to comply with Chief Martin's directive to return to work on November 30, 1994.

In addition to Dr. Dauhajre, the following witnesses testified for Potente: Lieutenant Hoppes, Investigator Robert Valdora, Investigator Mary Reinke, and Lawrence Henderson, the County's Director of Personnel. Chief Martin, Detective Kevin Wilder, and Investigator John Bigger testified for the defense. It was undisputed that the County did not seek to have Potente examined by an alternate physician, nor did it request tests to determine if Potente could perform the essential functions of his job. Moreover, the County did not present a description of the essential duties of Potente's position.

At the conclusion of all of the evidence, the County moved for a directed verdict. Potente cross-moved for the same relief. Judge Marie P. Simonelli granted Potente's motion and directed a liability verdict in his favor. The judge concluded that Potente had met the LAD's three-prong test for handicap discrimination by demonstrating that: (1) he was handicapped; (2) he was qualified to perform the essential functions of his job with or without accommodation; and (3) he had suffered adverse employment action because of his handicap.

As Judge Simonelli viewed the evidence, the County was estopped from denying Potente's handicap status because Dr. Dau-

hajre, the physician furnished by the County, had found that Potente was handicapped. The judge found it "wrong" for the County to order Potente to return to work, knowing that he was totally disabled. The judge found from the undisputed evidence that the only job function that Potente was unable to perform was use of a firearm. However, although Potente had initially thought the function to be "essential" to his employment, it in fact was not. Therefore, once his shoulder pain was relieved, Potente would have been able to perform the duties of his employment with or without accommodation. The judge found that during the time that Potente's shoulder pain persisted, Potente was unable to return to his job due to this disability and as a result, he lost his job. Judge Simonelli found, "[n]o doubts, no suspicions, no contrary inferences could be raised, no reasonable minds could differ about this."

After the judge directed a verdict on liability for Potente, the issues of compensatory and punitive damages were submitted to the jury. The jury returned a verdict of $50,000 for pain and suffering damages and $200,000 in lost wages. The jury denied damages for future wage loss and punitive damages. The judge awarded Potente prejudgment interest in the amount of $67,340.26 and counsel fees in the amount of $111,164.81.

The County moved for reconsideration, a new trial, and judgment n.o.v. Judge Simonelli denied these motions. This appeal follows.

### III

On appeal, the County contends that: (1) Potente was an at will employee subject to termination at the discretion of the Prosecutor; (2) Potente's LAD claim should have been dismissed; and (3) Potente failed to establish a prima facie case of discrimination pursuant to the LAD. We reject these contentions.

At the outset, we note that the County did not present medical evidence to refute Dr. Dauhajre's testimony. The County's case is premised on the argument that Potente was able to return to work

on November 30, 1994, but willfully refused to do so. Dr. Dauhajre's testimony negates the County's position because he concluded that Potente was unable to return to work at that time. Therefore, because the only medical evidence presented at trial was that of Dr. Dauhajre, the County is bound by his expert opinion.

The County first argues that because Potente was an at-will public employee, he could be terminated at any time. This general principle is true. However, Potente's contention is not that he was merely fired, but that he was fired for a discriminatory reason, i.e., he was temporarily handicapped. We are mindful that "public employers retain wide latitude in hiring and firing employees who serve in at-will, statutorily-created positions." *Golden v. County of Union*, 163 *N.J.* 420, 429, 749 *A.2d* 842 (2000). Nonetheless, where a public employer's actions are "invidiously discriminatory or contrary to some other pertinent law," the employer may not discharge an employee without a formal hearing. *Id.* at 433, 749 *A.2d* 842; *see N.J.S.A.* 34:15–39.1 (providing that a public employer cannot discriminate against an employee just because he or she has claimed workers' compensation benefits).

## IV

[Section IV, concerning a separate and discrete issue, is redacted from publication.]

## V

The County alternatively argues that if this court upholds the judgment, Potente is not entitled to collect prejudgment interest against a public entity. There are no reported cases on this precise issue. However, there are several authorities, which when read together with the LAD, support a holding that prejudg-

ment interest may be awarded in an LAD suit against a public entity.

Generally, *Rule* 4:42–11(b), establishes that:

> Except where provided by statute with respect to a public entity or employee, and except as otherwise provided by law, the court shall, in tort actions . . . include in the judgment simple interest, calculated as hereafter provided, from the date of the institution of the action or from a date 6 months after the cause of action arises, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest.

The County argues that the New Jersey Torts Claim Act (TCA) [3] creates a bar to the scope of that court rule. Specifically, *N.J.S.A.* 59:9–2a provides in part, "[n]o interest shall accrue prior to the entry of judgment against a public entity or public employee." Thus, the County argues that a successful LAD claimant cannot seek prejudgment interest from a public entity. We reject this argument.

We note that the LAD does not expressly address prejudgment interest. However, we have previously held that prejudgment interest should be included with damages awarded in a LAD suit against a private employer. *Gallo v. Salesian Soc'y, Inc.*, 290 *N.J.Super.* 616, 661, 676 *A.2d* 580 (App.Div.1996). Our rationale was that in 1990, the Legislature amended the LAD to add the following finding and declaration:

> The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm . . .
>
> Such harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.
>
> [*N.J.S.A.* 10:5–3.]

We also noted that *N.J.S.A.* 10:5–13 provides, "[a]ll remedies available in common law tort actions shall be available to prevailing plaintiffs. These remedies are in addition to any provided by the LAD or any other statute." *Gallo, supra,* 290 *N.J.Super.* at

---

[3] *N.J.S.A.* 59:1–1 to –12.

661, 676 *A*.2d 580. These principles formed the basis for our holding in *Gallo,* wherein we concluded that the Legislature intended *Rule* 4:42–11(b) to apply to LAD claims. *Ibid.*; *see Baker v. Nat'l State Bank,* 353 *N.J.Super.* 145, 159, 801 *A*.2d 1158 (App.Div.2002) (reiterating the *Gallo* holding and stating that, in a LAD action against a private employer, prejudgment interest is mandated because its purpose is compensatory, that is to indemnify the claimant for moneys he would presumably have earned if payment had not been delayed).

Now, we turn to whether that same analysis applies to a public employer. We begin our analysis by noting that the LAD specifically defines "employer" to include "the State, any political or civil subdivision thereof, and all public officers, agencies, boards or bodies." *N.J.S.A.* 10:5–5e. We recognize that the TCA creates an exception to the broad sweep of *Rule* 4:42–11(b) regarding prejudgment interest against public employers in tort actions. However, we conclude that by enacting the 1990 amendments to the LAD, the Legislature intended to allow LAD claimants against public employers to recover the full measure of these damages, including prejudgment interest. We quote, once again from the legislative declaration that the harms caused by discrimination

have, under the common law, given rise to legal remedies, including compensatory and punitive damages. **The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.**

[*N.J.S.A.* 10:5–3 (emphasis added).]

We construe this expression of legislative intent, which came several years after the enactment of the TCA, as a clear mandate that all remedies, including prejudgment interest, be available to all successful LAD claimants, whether they prevail against a private or public entity employer.

The County argues that prejudgment interest was not a common law remedy, nor one created by statute, rather it was created by court rule. Regardless, the Legislature's "liberal construction" directive trumps any technicality concerning the origin of prejudg-

ment interest practice. It is clear that the Legislature intended to provide persons aggrieved by LAD violations the usual remedies available in tort actions. In that respect we note that punitive damages, which are expressly barred by the TCA, have been allowed against public entities in LAD actions. *Cavuoti v. New Jersey Transit Corp.*, 161 *N.J.* 107, 132–33, 735 *A.*2d 548 (1999). The same applies to claims against public entities pursuant to the Conscientious Employee Protection Act (CEPA).[4] *Green v. Jersey City Bd. of Educ.*, 177 *N.J.* 434, 441, 828 *A.*2d 883 (2003).

Moreover, the Supreme Court has held that the purposes of the LAD and the CEPA are different from the TCA. *Id.* at 443, 828 *A.*2d 883. Writing for the majority, the Chief Justice recognized that unlike the TCA, the CEPA and the LAD are civil rights statutes, aimed at protecting and encouraging "employees to report illegal and unethical workplace activities and discourag[ing] public and private sector employers from engaging in such conduct." *Ibid.* (citing *Abbamont v. Piscataway Tp. Bd. of Educ.*, 138 *N.J.* 405, 431, 650 *A.*2d 958 (1994)). On the contrary, the purpose of the TCA is to "reestablish the immunity of public entities while coherently ameliorating the harsh results of the doctrine [of sovereign immunity]." *Beauchamp v. Amedio*, 164 *N.J.* 111, 115, 751 *A.*2d 1047 (2000). Our holding today is consonant with this distinction.

Affirmed.

---

[4] *N.J.S.A.* 34:19–1 to –8.