**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2083-19

TODD KELLY,

     Plaintiff-Appellant,

v.

J. CHRISTIAN BOLLWAGE,
JAMES COSGROVE, CITY OF
ELIZABETH, ELIZABETH
POLICE DEPARTMENT,
PATRICK SHANNON, and
TYRONE TORNER,

     Defendants-Respondents.

_____

ROBERT BRENNAN, JAMES
KEARNS, and GERALD
MCDONALD,

     Plaintiffs-Appellants,

v.

J. CHRISTIAN BOLLWAGE,
JAMES COSGROVE, CITY OF
ELIZABETH, ELIZABETH
POLICE DEPARTMENT,
PATRICK SHANNON, and

TYRONE TORNER,

    Defendants-Respondents.

_____

       Argued May 26, 2021 – Decided August 2, 2021

       Before Judges Geiger and Mitterhoff.

       On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket Nos. L-2647-16 and L-3562-16.

       Joshua F. McMahon argued the cause for appellants.

       Robert F. Varady argued the cause for respondents City of Elizabeth and J. Christian Bollwage (La Corte, Bundy, Varady & Kinsella, attorneys; Robert F. Varady, of counsel; Christina M. DiPalo, on the brief).

       Michael S. Simitz argued the cause for respondent James Cosgrove (Kologi Simitz, attorneys; Edward J. Kologi and Michael S. Simitz, of counsel and on the brief).

       Robert F. Renaud argued the cause for respondent Patrick Shannon (Renaud DeAppolonio, LLC, attorneys; Robert F. Renaud and Catherine M. DeAppolonio, on the brief).

PER CURIAM

    Plaintiffs Todd Kelly, Robert Brennan, James Kearns, and Gerard McDonald appeal the order granting summary judgment to defendants J. Christian Bollwage, James Cosgrove, the City of Elizabeth (Elizabeth), the

2

Elizabeth Police Department (EPD), and Patrick Shannon. They also appeal the denial of their motions for reconsideration and recusal of the trial court judge. We affirm in part, reverse in part, and remand.

I.

The record reflects the following pertinent facts when the evidence is viewed "in the light most favorable to the non-moving" plaintiffs. W.J.A. v. D.A., 210 N.J. 229, 238 (2012) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995)). At all times relevant to this matter, Bollwage was the mayor of Elizabeth, Cosgrove was the director of the EPD, Shannon was the Chief of Police, and Tyrone Torner was Deputy Chief.

Plaintiffs were sergeants in the EPD. In September 2013, plaintiffs took the Civil Service Police Lieutenant Examination in hopes of being promoted to lieutenant. Kelly, Kearns, Brennan, and McDonald, in that order, had the four highest examination scores. The corresponding eligible list was active for three years from February 6, 2014 through February 5, 2017.

In March 2014, plaintiffs learned that on January 13, 2014, Cosgrove submitted a request for certification of three sergeants for lieutenant positions from the prior eligible list set to expire on February 2, 2014. The certification request indicated there were three vacancies for lieutenant and identified the

three highest ranking sergeants as Jose A. Rodriguez, Michael B. Niewinski, and Lawrence Gioconda, in that order.

Plaintiffs believed there was only one vacancy, and that Cosgrove was prospectively hiring candidates for not-yet-vacant positions, in violation of N.J.A.C. 4A:4-4.8(b). Although a second vacancy occurred on March 1, 2014, due to a retirement, plaintiffs argued that under N.J.A.C. 4A:4-4.8(b), the vacancy did not extend or toll the February 2, 2014 expiration of the eligible list. Plaintiffs claimed that the appointing authority's reliance on the expired list "obstructed" their "lawful opportunity to participate in the selection and appointment process" in violation of N.J.A.C. 4A:10-1.1(c). Finally, plaintiffs claimed Cosgrove made a false and inaccurate certification request, in violation of N.J.A.C. 4A:10-1.1(d).

Kelly and Kearns met with Lieutenant Richard Shaughnessy, then President of the Superior Officers Association (SOA), to inform him that Cosgrove was violating N.J.A.C. 4A:4-4.8(b). Around March 18, 2014, Shaughnessy met with Cosgrove and explained Kelly and Kearns would appeal two of the promotions from the inactive list. Cosgrove stated he still intended to promote the three sergeants from the expiring list. On March 21, 2014, Shaughnessy met with Kelly and Kearns to inform them that Bollwage "wanted

A-2083-19

him to let us know that if we filed an appeal and if anybody got demoted because of it, he would freeze our list, never promote us, and, if need be, demote captains in order to fill the open lieutenants list."

On April 1, 2014, Rodriguez, Niewinski, and Gioconda were promoted to Lieutenant. Kelly, Kearns, and McDonald appealed the promotions to Civil Service Commission (Commission). Plaintiffs requested that two of the three promotions be voided, and that the appointing authority be ordered to appoint one of the top three eligible candidates from the current eligible list. On May 6, 2015, the Commission issued a final administrative decision granting the appeal in part. The Commission determined that two appointments from the certification request were valid but rescinded the invalid third appointment. The Commission explained:

> The disposition due date may be extended beyond the expiration date of the eligible list to fill current vacancies. Under no circumstances shall a disposition due date be extended beyond the expiration date of the eligible list when vacancies do not exist. An anticipated vacancy shall not be considered the same as an existing vacancy.

On May 9, 2014, Kelly, Kearns, and McDonald filed a declaratory judgment action seeking injunctive relief, naming Elizabeth and Cosgrove as defendants. On May 22, 2014, less than twenty-four hours after being served

5

with the complaint, Cosgrove advised Shaughnessy to tell Kelly that Kelly was being transferred from the Narcotics Unit to the Patrol Division, a less desirable assignment, effective June 2, 2014. On May 27, 2014, Shannon issued an order that transferred both Kelly and McDonald from investigative assignments to patrol. Shannon later testified that the transfer was requested by Cosgrove. Internal Affairs (IA) Sergeant Stephen Negrey testified that Shannon "could be disciplined" if he did not comply with Cosgrove's request. Kelly, Kearns and McDonald dismissed the declaratory judgment action with prejudice by stipulation around the same time that the Commission issued its final decision in May 2015.

In September 2014, Kelly became aware that he was being investigated by IA for violating the department's Extra Duty Assignment Rules by allegedly "leaving an assigned extra duty post early." On September 29, 2014, Negrey informed Kelly that the investigation revealed Kelly was "at his designated assignment for the entire shift and that [Kelly] did not show up late nor . . . leave early." Negrey advised Kelly that Cosgrove played an active role in investigating the matter, which was highly unusual for a police director, especially since Cosgrove served as the EPD's Hearing Officer for disciplinary proceedings.

A-2083-19

On November 22, 2014, Kelly and four other officers received commendations for their role in an April 2014 incident involving the exchange of gunfire. The other four officers received the prestigious Valor Award, while Kelly received a lesser Merit Award with no explanation.

On February 3, 2015, Shannon issued Special Order No. 2019, which denied Kelly and forty-seven other officers work permits after "a careful review of the attendance records." Kelly thereafter learned that forty-three officers were granted a work permit despite having worse attendance records than he had. Kelly learned from then SOA President Julian Hilongos that Cosgrove mistakenly placed Kelly on the denial list. Cosgrove later informed Kelly that Shannon was responsible for the work permit denial.

Later in February 2015, Kelly requested to attend, at no cost to the EPD, the four-day FBI's Leadership & Ethics for Law Enforcement Supervisors School to be held at the Bergen County Police Academy in May 2015. By then, Kelly had been a sergeant for ten years yet had not attended that school. Kelly received no official response to his request.

Plaintiffs also alleged that beginning in February 2014, they were subjected to harassment by co-workers and superiors. At one point, Cosgrove told officers to blame Kelly and Kearns for the lack of promotions. In March

7

2015, Kelly learned that Gioconda referred to Kelly on Facebook posts as "an enemy within our walls," called Kelly and two other sergeants "cutthroats," "motherf**kers," and "b*tches," and said he "trust[ed] people in the streets with drugs, guns" and who are "anti[-]police [more than] these Mother F**kers." That same month, when Kelly "walked into the roll-call room at the beginning of his shift," Torner stated, "[h]ere comes the troublemaker" and told Kelly that Giaconda "did nothing wrong" regarding his Facebook posts. Giaconda was Kelly's direct superior after he made the Facebook posts.

In addition, four lieutenant positions became vacant from February 2014 to August 2016, none of which were filled due to Bollwage's hiring "freeze." On April 16, 2015, Kelly learned six patrolmen were being promoted to sergeant later that month. Kelly asked Cosgrove to consider promoting him to lieutenant during the promotion ceremony. Cosgrove informed Kelly he could not promote him because he took Kelly's complaint "personally." By email dated April 20, 2015, Elizabeth's municipal solicitor advised Kelly's attorney "that the City would only consider the promotion to the [lieutenant] position if both the [Civil Service] and Superior [Court] matters were ended." Kelly did not do so.

On May 6, 2015, another lieutenant vacancy emerged when the Civil Service Commission rescinded Gioconda's appointment. Two days later,

A-2083-19

Bollwage informed Kelly's mother, who was a committee member at that point, that he would "never promote" Kelly after Kelly went against Elizabeth by filing the Civil Service appeal.

On July 1, 2015, a third lieutenant position became vacant. To compensate for the vacancies, Cosgrove issued a July 20, 2015 memo ordering Patrol Division Captains to cover vacant Patrol Lieutenant shifts. On September 8, 2015, Cosgrove rescinded the July 20, 2015 memo after the SOA filed a grievance for violating the collective bargaining agreement.

On May 13, 2016, Kelly approached Cosgrove and asked to be promoted; once again, his request was denied. In July 2016, a fourth lieutenant vacancy emerged when Rodriguez retired. On July 25, 2016, Cosgrove promoted two officers to sergeant but no sergeants to lieutenant.

On August 12, 2016, Kelly filed a complaint against Bollwage, Cosgrove, Elizabeth, EPD, Shannon, and Torner, alleging: (a) defendants violated the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14 (count one); (b) defendants violated the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2 (count two); (c) defendants conspired to violate of N.J.A.C. 4A:4-4.8(b) (count three); (d) Elizabeth and EPD were vicariously liable for the wrongful acts of Bollwage, Cosgrove, Shannon, and Torner (count four); and (e)

defendants' retaliatory actions were "motivated by actual malice or done with willful and wanton disregard of the rights of plaintiff," and "Bollwage, Cosgrove, Shannon and Torner actually participated in, and/or were willfully indifferent to, the wrongful retaliatory conduct," rendering defendants liable for punitive damages under the CEPA (count five). The complaint explicitly included the failure to fill the fourth lieutenant vacancy that emerged on July 1, 2016.

On November 3, 2016, Brennan, Kearns, and McDonald filed a similar complaint against defendants. A December 16, 2016 order consolidated the actions. Plaintiffs dismissed their claims against Torner with prejudice in November 2017.

Following extensive discovery, in July 2019, defendants moved for summary judgment. Cosgrove argued: (1) there was no showing of adverse employment actions that violated CEPA; (2) the claims were time-barred by the one-year statute of limitations; (3) Brennan was not part of the 2014 filings that constitute a whistleblowing activity; and (4) the continuing violation doctrine does not apply to discrete act cases, only hostile work environment cases. Shannon incorporated Cosgrove's arguments and further asserted that plaintiffs did not allege he engaged in retaliatory actions. Shannon also argued he did not

10

have any appointing authority and is now retired. Elizabeth and Bollwage reiterated Cosgrove's arguments, adding that Bollwage had no power to retaliate against plaintiffs because Cosgrove was the sole appointing authority.

In response, plaintiffs contended defendants engaged in discrete acts of retaliation as well as a continuing pattern of retaliation, all of which occurred within the statute of limitations. They further contended that Bollwage was the de facto appointing authority and thus liable under CEPA. Plaintiffs' opposition specifically mentioned the July 1, 2016 vacancy.

During oral argument, plaintiffs asserted that the failure to promote anyone to fill the July 1, 2016 vacancy was a discrete act clearly within the one-year statute of limitations. In the alternative, plaintiffs contended that if the failure to promote to fill the July 1, 2016 vacancy is viewed as a non-discrete act under a hostile work environment analysis, the failure to promote provided a basis under the continuing violation doctrine to allow in all evidence of retaliation outside of the statute of limitations.

On August 29, 2019, the judge issued an order and accompanying written opinion granting summary judgment to defendants dismissing the complaints with prejudice. The judge distinguished discrete acts from a continuing violation and found the alleged retaliatory

11

acts are most appropriately categorized as multiple discrete acts, and not as a "series of separate acts that constitute one 'unlawful employment practice.'" The frequency with which these events occurred—as well as their severity, threatening nature, and potential for humiliation—do not reach the bar of creating a continuing violation. As such, any of the discrete acts that allegedly occurred before August 11, 2015 are thereby time[-]barred under N.J.S.A. 34:19-5, and therefore will not be considered by this [c]ourt.

With respect to discrete acts, the judge found the latest discrete act that Kelly alleged occurred on May 8, 2015, "when Kelly learned that . . . Bollwage refused to grant him a promotion due to Kelly's institution of this 2014 lawsuit." This was the same date that Bollwage informed Kelly's mother that Bollwage would never promote Kelly because of his disruption.

The judge found that the latest discrete acts alleged by Kearns, McDonald, and Brennan occurred on July 1, 2015, the date of the third lieutenant vacancy. The judge noted other acts of discrete discrimination, such as transfers of duties and the department's failure to promote plaintiffs on May 6, 2015. He found that "[a]ll of the alleged violations . . . occurred prior to August 11, 2015," and not within CEPA's one-year statute of limitations. The judge did not mention the unfilled July 1, 2016 vacancy, which occurred just weeks before the August 12 and November 3, 2016 filing dates.

A-2083-19

The judge found Brennan could not sustain a claim under CEPA because:

> Brennan ha[d] not engaged in any whistleblowing or protected activity. He did not join the other [p]laintiffs in the Civil Service appeal or the [2014] Superior Court action. Nor did he allege that he made a disclosure to a supervisor or public body of an activity of his employer that he believed to be a violation of a rule or regulation. Indeed, Brennan's name does not even appear [in] [c]ount [o]ne . . . [of] his own [c]omplaint. Consequently, . . . Brennan has failed to allege that he has engaged in any whistleblowing activity. When questioned at his deposition what whistleblowing activity he engaged in, Brennan testified that he was not receiving a promotion because of a lawsuit he was not part of. This [c]ourt finds that claiming one suffered as collateral damage from [c]o-[p]laintiffs' whistleblowing is not sufficient to sustain a CEPA claim.

The judge also found that Shannon and Bollwage could not be held liable under CEPA because nothing "in the record suggests [they] took any retaliatory actions against [p]laintiffs." Shannon and Bollwage "could not have done so given that they had no input in or power over the promotion process."

In light of these findings, the judge did not reach the issues of the entire controversy doctrine, negligent supervision, or punitive damages.

Plaintiffs moved for reconsideration due to the judge's failure to consider the July 1, 2016 lieutenant vacancy and recusal due to an appearance of impropriety. Plaintiffs alleged the judge's brother, who is a certified public

13

accountant (CPA), provided auditing and accounting services to the Elizabeth Parking Authority (Parking Authority) under a professional services contract.

On October 31, 2019, the court issued an order and written opinion denying reconsideration and recusal. Although the judge stated he had "considered all of the facts, citations, and arguments advanced by both parties," he again did not mention the July 1, 2016 lieutenant vacancy. As to reconsideration, the judge found plaintiffs did not demonstrate any "matters or controlling decisions the [c]ourt overlooked or erred, or that the decision was palpably incorrect or irrational." As to recusal, the judge found there was no appearance of bias because his brother was an independent contractor for the Parking Authority, an autonomous public entity. Further, the court found plaintiffs' failure to raise their recusal claim prior to the entry of summary judgment demonstrated a lack of sincere concern.

On November 19, 2019, plaintiffs filed a second motion for reconsideration and recusal. After denying oral argument, the judge issued an order and oral decision denying the motions, once again without mentioning the July 1, 2016 vacancy. He found plaintiffs were rehashing the same arguments they raised in their summary judgment and first reconsideration motions.

On appeal, plaintiffs argue:

I. STANDARD OF REVIEW

II. PLAINTIFFS' CEPA CLAIMS FALL WITHIN THE STATUTE OF LIMITATIONS AND SUMMARY JUDGMENT WAS THEREFORE IMPROPER.

A. Defendants' Conduct Constitutes a Continuing Violation and thus Falls Within the Statute of Limitations.

1. Defendants Engaged in A Non-Discrete Failure to Promote Which is Distinguishable from a Typical Failure to Promote Case.

2. Defendants Engaged in Other Separate but Relatively Minor Instances of Behavior Directed Against Plaintiffs that Combine to Make Up a Pattern of Retaliatory Conduct.

B. Defendants' Refusal to Promote Plaintiffs After the Retirement of Jose Rodriquez on July 1, 2016 is a Discrete Act that Falls Within the One[-]Year Statute of Limitations.

III. BRENNAN DOES NOT NEED TO PERSONALLY ENGAGE IN THE WHISTLEBLOWING ACTIVITY IN ORDER TO SUSTAIN A CEPA CLAIM.

IV. BOLLWAGE AND SHANNON PARTICIPATED IN THE PROMOTION PROCESS AND ENGAGED IN RETALIATORY ACTIONS AGAINST PLAINTIFFS.

V. THE TRIAL JUDGE SHOULD HAVE BEEN RECUSED BASED ON THE APPEARANCE OF IMPARTIALITY.

15

## II.

We first address the grant of summary judgment to defendants. We review entry of summary judgment de novo, applying the same legal standard as the trial court. Conley v. Guerrero, 228 N.J. 339, 346 (2017) (citing Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co., 224 N.J. 189, 199 (2016)). Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Templo Fuente, 224 N.J. at 199 (quoting R. 4:46-2(c)). "The court shall find the facts and state its conclusions in accordance with [Rule] 1:7-4." R. 4:46-2(c).

The trial court considers "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, 142 N.J. at 540. "In applying that standard, a court properly grants summary judgment 'when the evidence "is so one-sided that one party must prevail as a matter of law."'" Davis v. Brickman Landscaping, LTD, 219 N.J. 395, 406 (2014) (quoting Brill, 142 N.J. at 540). Thus, both the trial and appellate court must "review the motion record against

16

not only the elements of the cause of action but also the evidential standard governing that cause of action." Bhagat v. Bhagat, 217 N.J. 22, 40 (2014). "When no issue of fact exists, and only a question of law remains, [a reviewing court] affords no special deference to the legal determinations of the trial court." Templo Fuente, 224 N.J. at 199 (citing Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995)).

"The Legislature enacted CEPA to 'protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.'" Dzwonar v. McDevitt, 177 N.J. 451, 461 (2003) (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994)). "CEPA ensures that employees are 'protected from retaliation and employers are deterred from activities that are illegal or fraudulent, or otherwise contrary to a clear mandate of public policy.'" Chiofalo v. State, 238 N.J. 527, 540 (2019) (quoting D'Annunzio v. Prudential Ins. Co. of Am., 192 N.J. 110, 120 (2007)). As a remedial statute, CEPA "promotes a strong public policy of the State" and "should be construed liberally to effectuate its important social goal." Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 555 (2013) (quoting Abbamont, 138 N.J. at 431). When enacted,

A-2083-19

CEPA was described "as the most far reaching 'whistleblower statute' in the nation." Mehlman v. Mobil Oil Corp., 153 N.J. 163, 179 (1998).

To establish a prima facie case under CEPA, a plaintiff must prove:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;
>
> (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c);
>
> (3) an adverse employment action was taken against him or her; and
>
> (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [Lippman v. Ethicon, Inc., 222 N.J. 362, 380 (2015) (quoting Dzwonar, 177 N.J. at 462).]

"The evidentiary burden at the prima facie stage is 'rather modest . . . .'" Zive v. Stanley Roberts, Inc., 182 N.J.436, 447 (2005) (quoting Marzano v. Comput. Sci. Corp., 91 F.3d 497, 508 (3d Cir. 1996)). Moreover, "[t]hese requirements must be liberally construed to effectuate CEPA's important social goals." Maimone v. City of Atl. City, 188 N.J. 221, 230 (2006).

CEPA prohibits employers from retaliating against an employee who:

> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ; or

(2) is fraudulent or criminal . . . ;

b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer . . . ; or

c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ;

(2) is fraudulent or criminal . . . ; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

[N.J.S.A. 34:19-3.]

CEPA defines "retaliatory action" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e). "Failing to promote an employee can constitute an adverse employment action." Royster v. N.J. State Police, 439 N.J. Super. 554, 575 (App. Div. 2015) (citing

19

Jamison v. Rockaway Twp. Bd. of Educ., 242 N.J. Super. 436, 445 (App. Div. 1990)).

Ordinarily, a plaintiff has one year from the occurrence of the retaliation to file an action under CEPA. N.J.S.A. 34:19-5. However, retaliatory actions can be a single discrete action, like the failure to promote, or a hostile work environment, which consists of "many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct." Green v. Jersey City Bd. of Educ., 177 N.J. 434, 448 (2003). Under the continuing violation doctrine, which applies to CEPA claims, id. at 446-49, a "plaintiff may pursue a claim for discriminatory conduct if he or she can demonstrate that each asserted act by a defendant is part of a pattern and at least one of those acts occurred within the statutory limitations period," Shepherd v. Hunterdon Dev. Ctr., 174 N.J. 1, 6-7 (2002) (citing West v. Phila. Elec. Co., 45 F.3d 744, 754-55 (3d Cir. 1995)).

Kelly filed his complaint on August 12, 2016. Brennon, Kearns and McDonald filed their complaint on November 3, 2016. Thus, any retaliatory action must have taken place less than one year earlier to state a viable CEPA

claim, unless the continuing violation doctrine applies.[1]  The judge found that the latest alleged retaliation against Kelly took place on May 6, 2015, the date Kelly learned he would not be promoted to fill a recent lieutenant vacancy and Bollwage informed Kelly's mother that Kelly would not be promoted.  In addition, the judge mentioned that on July 1, 2015, Kearns and McDonald were not promoted to lieutenant when another vacancy emerged.  For reasons not made clear by the record and contrary to Rule 4:46-2(c), the court failed to make findings regarding the July 1, 2016 vacancy.

Viewing the facts in a light most favorable to plaintiffs and affording them all reasonable inferences, we find that Kelly, Kearns, and McDonald engaged in whistleblowing, as defined by CEPA, by complaining to superiors, filing the Civil Service appeal, and filing the declaratory judgment action.  We address Brennan separately.

---

[1]  While plaintiffs also alleged defendants violated the violated NJCRA (count two of each complaint), which has a two-year statute of limitations, Lapolla v. Cnty. of Union, 449 N.J. Super. 288, 298 (App. Div. 2017), plaintiffs elected to proceed under CEPA and did not oppose dismissal of their NJCRA claims.  The judge's references to the LAD in his decisions were in error as plaintiffs did not plead LAD violations.

Brennan argues that the trial court erred in finding he did not have a valid CEPA claim because he did not personally engage in any whistleblowing activity. We agree.

Generally, litigants do not have standing "to assert the rights of third parties." Stubaus v. Whitman, 339 N.J. Super. 38, 47-48 (App. Div. 2001) (citing State Dep't of Env't Prot. and Energy v. Dopp, 268 N.J. Super. 165, 173 (App. Div. 1993)). In this case, Brennan was asserting his own promotional rights and Elizabeth's retaliatory refusal to promote any eligible sergeants from the current eligible list to lieutenant affected him. Denying Brennan the right to claim that he should have been promoted, but for the defendant's unlawful treatment, would affect Brennan adversely. Coworkers of the complainant may bring their own retaliation claims against the employer in appropriate circumstances. See Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 629-33 (1995) (holding that co-employees had standing to bring claims under the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42, alleging they were discharged in violation of N.J.S.A. 10:5-12(d), based on being friends or relatives of a co-employee, in retaliation for the co-employee's assertion of discrimination claims against the employer). This principle applies with equal force to retaliation claims under CEPA.

The judge found that all of plaintiffs' claims were time-barred. Our review of that decision hinges upon whether the conduct involved discrete acts of retaliation or ongoing, non-discrete instances of retaliation creating a hostile work environment. CEPA claims based on discrete acts of retaliation do not fall within the continuing violation doctrine and must be filed within one year of occurrence or are time-barred. Green, 177 N.J. at 446-47.

A retaliatory failure to promote is a discrete act, separately actionable as an "unlawful employment practice." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002). When the failure to promote relates to a specific vacancy caused by retirement or promotion as opposed to a promotion in job title that could have been granted at any time, the continuing violation doctrine does not apply. Miller v. Beneficial Mgmt. Corp, 977 F.2d 834, 844 (3d Cir. 1992). Here, each of the four lieutenant openings were specific vacancies that resulted from retirement or promotion. Accordingly, plaintiffs were required to file their failure to promote claims within one year of each of those discrete acts, which commenced on the date each vacancy occurred.

The vacancies occurred on April 30, 2015, May 6, 2015, July 1, 2015, and July 1, 2016. Plaintiffs filed their complaints on August 12, 2016 and November 3, 2016, respectively. Therefore, only the July 1, 2016 vacancy fell well within

23

CEPA's one-year limitations period. Accordingly, the trial court properly granted summary judgment dismissing plaintiffs' failure to promote claims relating to the vacancies occurred on April 30, 2015, May 6, 2015, and July 1, 2015,[2] but erred in granting summary judgment dismissing the failure to promote claims related to the July 1, 2016 vacancy.

We next address the dismissal of plaintiffs' hostile work environment claims. In Wilson v. Wal-Mart Stores, 158 N.J. 263, 272 (1999), a case brought under the LAD, the Court held that "[w]hen an individual is subject to a continual, cumulative pattern of tortious conduct, the statute of limitations does not begin to run until the wrongful action ceases." In Shepherd, another LAD action, the Court highlighted the difference between a hostile work environment claim that falls within the continuing violation doctrine and a claim based on a discrete act that does not. 174 N.J. at 19-20.

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of

---

[2] While the failure to promote relating to the first three vacancies are time-barred, plaintiffs may use them "as background evidence in support of [their] timely claim." Roa v. Roa, 200 N.J. 555, 567 (2010) (quoting AMTRAK v. Morgan, 536 U.S. 101, 113 (2002)).

harassment may not be actionable on its own. Such claims are based on the cumulative [e]ffect of individual acts.

. . . .

In determining whether an actionable hostile work environment claim exists, we look to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." . . . A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice." . . . It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

That act need not, however, be the last act. As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has "occurred," even if it is still occurring. Subsequent events, however, may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole.

[Ibid. (alterations in original) (quoting Morgan, 536 U.S. at 115-17 (citations and footnotes omitted)).]

The Court adopted the following two-prong test:

25

First, have plaintiffs alleged one or more discrete acts of discriminatory conduct by defendants? If yes, then their cause of action would have accrued on the day on which those individual acts occurred. Second, have plaintiffs alleged a pattern or series of acts, any one of which may not be actionable as a discrete act, but when viewed cumulatively constitute a hostile work environment? If yes, then their cause of action would have accrued on the date on which the last act occurred, notwithstanding "that some of the component acts of the hostile work environment [have fallen] outside the statutory time period."

[Id. at 21 (alteration in original) (quoting Morgan, 536 U.S. at 117).]

"The policy concerns underpinning the determination in Shepherd in respect of LAD claims require the application of the Morgan/Shepherd framework in CEPA actions. 'Retaliation,' as defined by CEPA, need not be a single discrete action." Green, 177 N.J. at 448. "Indeed, 'adverse employment action taken against an employee' . . . can include . . . many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct." Ibid. (quoting N.J.S.A. 34:19-2(e)).

Here, plaintiffs, or some of them, were transferred to less desirable positions, given an inferior Valor award, denied work permits, investigated by IA for baseless accusations, and/or denied additional training. In addition,

plaintiffs were subjected to ongoing harassment by coworkers and superiors, including shaming plaintiffs in front of coworkers as "troublemakers" and incendiary Facebook messages describing plaintiffs as "cutthroats" and untrustworthy, for their opposition to others being promoted.

Management took no steps to end this course of harassment, which constituted "a pattern of retaliatory conduct." Ibid. Accordingly, plaintiffs may pursue their hostile work environment claims if "at least one of those acts occurred within the statutory limitations period." Shepherd, 174 N.J. at 6-7 (citing West, 45 F.3d at 754-55). Excluding the discrete acts of failing to promote, each of incidents comprising plaintiffs' hostile work environment claims occurred in or before March 2015, more than one year before plaintiffs' complaints were filed. Accordingly, the hostile work environment claims were properly dismissed.

Next, we address plaintiffs' contention that the trial court erred in finding Bollwage and Shannon did not participate in the promotional process or engage in retaliatory actions against them because "they had no input or power over the promotional process." Viewing the facts disclosed in discovery in the light most favorable to plaintiffs and affording them all reasonable inferences, we agree.

A-2083-19

The discovery was replete with evidence that Bollwage was personally involved in the EPD's appointment process.  For example, Shannon testified that Bollwage promoted him to Chief of Police.  Bollwage admitted that he, not the appointing authority, had promoted the current Chief of Police.  Shaughnessy testified that he discussed department promotions with Bollwage outside of Cosgrove's presence.  Shaughnessy indicated that while Bollwage and Cosgrove consulted on promotions, Bollwage was the final decision-maker.  Shaughnessy maintained that no one in the department was promoted without Bollwage's approval.

Plaintiffs contend that Bollwage was the architect of the lieutenant hiring freeze, telling Shaughnessy to "deliver a message" to Kelly and Kearns that if they filed the Civil Service appeal, he would freeze the lieutenant list for three years and demote captains to fill the vacant lieutenant positions.  Bollwage also told Kelly's mother that he had frozen the list.  When the appeal was filed, Bollwage told Shaughnessy and Shannon that there would be not promotions to lieutenant as long as the appeal and lawsuit was pending.  In contrast, Bollwage testified that he only had power to appoint the chief, not lieutenants.

Plaintiffs allege that Shannon participated in the retaliation directed at plaintiffs by implementing the promotional freeze orchestrated by Bollwage and

28

Cosgrove through manipulating schedules and transferring Kelly and McDonald to patrol. These material facts precluded summary judgment in favor of Bollwage and Shannon as to the July 1, 2016 vacancy.

We next address Elizabeth and Bollwage's argument that plaintiffs' CEPA claims are barred by the entire controversy doctrine because they were not included in their declaratory judgment action, which was voluntarily dismissed in May 2015. The trial court did not reach this issue, finding the claims were time-barred. We are unpersuaded by this argument.

The declaratory judgment action was an action in lieu of prerogative writs challenging municipal action pursuant to Rule 4:69. Kelly, Kearns, and McDonald sought judgment revoking the promotion of the third lieutenant and declaring that it violated Elizabeth's ordinances (count one). They also claimed that the April 1, 2014 promotion of three sergeants to lieutenant exceeded the limit on lieutenant positions imposed by Ordinance No. 3397 (count two). In contrast, this consolidated action sought the award of monetary damages and other relief under CEPA and NJCRA, which are not cognizable in an action in lieu of prerogative writs. See O'Neill v. Twp. of Washington, 193 N.J. Super. 481, 486 (App. Div. 1984) (holding that actions seeking money damages are not cognizable as actions in lieu of prerogative writs). Thus, plaintiffs did not have

29

"a 'fair and reasonable opportunity to have fully litigated [those] claim[s] in the original action.'" See Karpovich v. Barbarula, 150 N.J. 473, 481 (1997) (quoting Cafferata v. Peyser, 251 N.J. Super. 256, 261 (App. Div. 1991)). Nor is a jury trial available in an action in lieu of prerogative writs. O'Neill v. State Highway Dep't, 40 N.J. 326, 329 (1963). Accordingly, their CEPA claims were not barred by the entire controversy doctrine.

III.

We next consider the denial of plaintiffs' motions for reconsideration. Applying our analysis of the summary judgment motions, we affirm in part and reverse in part. The judge's failure to consider the July 1, 2016 vacancy and his dismissal of the failure to promote claim related to that vacancy were palpably incorrect. See Fusco v. Bd. of Educ. of City of Newark, 349 N.J. Super. 455, 462 (App. Div. 2002) (stating that reconsideration is appropriate when "either (1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or (2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence") (quoting D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990)). We reverse the denial of reconsideration related to the July 1, 2016 vacancy and affirm the denial of reconsideration relating to plaintiffs' other claims.

IV.

Lastly, we address the denial of plaintiffs' motions to recuse the motion judge. A party, "on motion made to the judge before trial or argument and stating the reasons therefor, may seek that judge's disqualification." R. 1:12-2. Motions for disqualification "are entrusted to the sound discretion of the judge and are subject to review for abuse of discretion." State v McCabe, 201 N.J. 34, 45 (2010) (citing Panitch v. Panitch, 339 N.J. Super. 63, 66 (App. Div. 2001)).

"The 'overarching objective of the Code of Judicial Conduct is to maintain public confidence in the integrity of the judiciary.'" State v. Presley, 436 N.J. Super. 440, 447 (App. Div. 2014) (quoting In re Advisory Letter No. 7-11 of the Sup. Ct. Advisory Comm., 213 N.J. 63, 71 (2013)). Therefore, "judges must avoid not only actual conflicts but also the appearance of impropriety to promote the public's trust . . . ." McCabe, 201 N.J. at 38. Thus, even "without any proof of actual prejudice, 'the mere appearance of bias may require disqualification.'" Presley, 436 N.J. Super. at 448 (quoting Panitch, 339 N.J. Super. at 67).

"Motions for recusal ordinarily require a case-by-case analysis of the particular facts presented." McCabe, 201 N.J. at 46 (disqualifying part-time judge in the absence of any evidence of bias or unfairness because the defendant's attorney is also the judge's adversary in another pending matter).

The standard to assess plaintiffs' request for recusal is: "Would a reasonable, fully informed person have doubts about the judge's impartiality?" DeNike v. Cupo, 196 N.J. 502, 517 (2008). As explained by the Court in State v. Dalal:

> Canon 3(C)(1) of the Code of Judicial Conduct provides that "[a] judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." Likewise, Rule 1:12-1(g) directs that judges shall not sit in any matter "when there is any . . . reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so." The rules, thus, "address actual conflicts and bias as well as the appearance of impropriety." McCabe, 201 N.J. at 43.
>
> [221 N.J. 601, 606 (2015) (alterations in original)].

Nonetheless, judges may not "err on the side of caution . . . ." State v. Marshall, 148 N.J. 89, 276 (1997). "It is improper for a judge to withdraw from a case upon a mere suggestion that he is disqualified 'unless the alleged cause of recusal is known by him to exist or is shown to be true in fact.'" Panitch, 339 N.J. Super. at 66-67 (quoting Hundred E. Credit Corp. v. Eric Schuster Corp., 212 N.J. Super. 350, 358 (App. Div. 1986)). "[T]he belief that the proceedings were unfair must be objectively reasonable." McCabe, 201 N.J. at 43 (alteration in original) (quoting Marshall, 148 N.J. at 279). Reasonable questions about the

fairness and impartiality of the judge cannot be established based on an amorphous suspicion.

We thus return to the starting question—considering the facts, "[w]ould a reasonable, fully informed person [would] have doubts about the judge's impartiality?" Dalal, 221 N.J. at 606 (quoting DeNike, 196 N.J. at 502). Plaintiffs point to the failure to consider the July 1, 2016 vacancy during three motion hearings. This unexplained, repeated failure to discuss the July 1, 2016 vacancy, which is a dispositive fact in determining whether plaintiffs' claims are time-barred, would cause "a reasonable, fully informed person to have doubts about the judge's impartiality." DeNike, 196 N.J. at 517. This appearance of bias requires disqualification. Presley, 436 N.J. Super. at 448

We recognize that "bias cannot be inferred from adverse rulings against a party." Strahan v. Strahan, 402 N.J. Super. 298, 318 (App. Div. 2008) (citing Matthews v. Deane, 196 N.J. Super. 441, 444-47 (Ch. Div. 1984)). "And the fact that a judgment resulting from previous proceedings is reversed on appeal is likewise not a sufficient ground for disqualification." State v. Walker, 33 N.J. 580, 591 (1960) (citations omitted). Nevertheless, while "[a]n error by the court in the previous proceeding does not necessarily justify an inference of bias and will not, by itself, furnish a ground for disqualification," it "might be sufficiently

blatant, and so lacking in an alternative, good faith explanation that the error would support a charge of bias." Marshall, 148 N.J. at 276. In his decisions denying reconsideration and recusal, the judge did not mention, much less correct, his failure to consider the July 1, 2016 vacancy, which is a dispositive fact in this case. Noticeably lacking is any explanation for this glaring omission.

Plaintiffs also point to the sizable professional services contract awarded to the judge's brother to perform accounting and auditing services for the Parking Authority. According to the Parking Authority's Executive Director, Mayor Bollwage is "working together" with the Parking Authority's Board of Commissioners "to make positive changes in the very progressive, challenging parking industry."

The Parking Authority is statutorily distinct and separate from Elizabeth under the Parking Authority Law, N.J.S.A. 40:11A-1 to -26. To that end, N.J.S.A. 40:11A-6(1) provides: "Every parking authority shall constitute a public body corporate and politic and a political subdivision of the State[,] . . . and having all the powers necessary or convenient to carry out and effectuate its corporate purposes and the purposes and provisions of this act."

The governing body of the municipality appoints the commissioners of the Parking Authority by resolution or ordinance. N.J.S.A. 40:11A-4. The

A-2083-19

commissioners serve five-year terms.  Ibid.  The commissioners may not be an officer or employee of the municipality.  N.J.S.A. 40:11A-5.  The authority selects a chairman and vice-chairman from among its commissioners.  Ibid.

Parking authorities must undergo annual audits performed by a registered municipal accountant or a CPA.  N.J.S.A. 40:11A-6.1.  Each year the Parking Authority advertises a Request for Qualifications to pre-qualify prospective accountants based on experience and expertise.  The judge's brother, who is not an employee of the Parking Authority or Elizabeth, submitted a Request for Qualification, and was awarded a professional services contract for accounting and auditing services by resolution of the Parking Authority.

Viewed in isolation, the professional services contract would not require recusal.  But coupled with the failure to consider the July 1, 2016 vacancy, the contract would increase the doubt of partiality in the mind of reasonable, fully informed person.  Again, plaintiffs were not required to show actual bias.

Defendants argue that plaintiffs' recusal motions were made in bad faith.  They note that plaintiffs' counsel was aware of the professional services contract by June 24, 2019.  Instead of promptly moving for recusal, plaintiffs waited until September 18, 2019, almost three months later, to move for recusal.  By then

the summary judgment motion had been filed, argued, and decided. We are unpersuaded by this argument.

Plaintiffs had no way of knowing that the judge would fail to consider the July 1, 2016 vacancy until he issued the order and written decision granting summary judgment to defendants. Nor could they know in advance that the judge would twice deny reconsideration. We discern no evidence of bad faith. Moreover, a judge is required to recuse himself "on the court's own motion " if grounds for disqualification exist. R. 1:12-1.

Considering the totality of the circumstances, we find that the judge misplaced his discretion in denying plaintiffs' recusal motions. On remand, the case shall be assigned to a different judge.

Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION