**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3481-24

CYNTHIA HAM,

    Plaintiff-Appellant,

v.

NOVARTIS INTERNATIONAL
AG, NOVARTIS
PHARMACEUTICALS
CORPORATION, ELIZABETH
McGEE and SHEFALI
KOTHARI, jointly, severally
and in the alternative,

    Defendants-Respondents.

_____

        Submitted December 16, 2025 – Decided May 7, 2026

        Before Judges Gooden Brown and Torregrossa-O'Connor.

        On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-0946-23.

        Berkowitz, Lichtstein, Kuritsky, Giasullo & Gross, LLC, attorneys for appellant (Evan Silagi and John C. Messina, on the briefs).

Duane Morris LLP, attorneys for respondents Novartis International AG, Novartis Pharmaceuticals Corporation, Elizabeth McGee and Shefali Kothari (Kristin D. Sostowski, Cassandra J. Neugold, Christa C. Cottrell, Rebecca Fitzpatrick and Amelia H. Bailey, on the brief).

The Dwyer Law Firm, LLC, attorneys for amicus curiae National Employment Lawyers Association of New Jersey (Andrew Dwyer, of counsel and on the brief).

PER CURIAM

By leave granted,[1] plaintiff Cynthia Ham appeals from the January 3, 2025 Law Division order dismissing with prejudice pursuant to Rule 4:6-2(e) five counts of her twelve-count complaint against her former employer and two company executives, as well as the February 14, 2025 order denying her motion for reconsideration. The complaint alleged violations of the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, and the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1 to -50. Plaintiff was employed as a compliance officer for defendant Novartis and sued parent company Novartis International AG, subsidiary Novartis Pharmaceuticals Corporation (collectively, Novartis), as well as Novartis

---

[1] We denied plaintiff's motion for leave to appeal and plaintiff moved for leave to appeal in our Supreme Court, which granted the motion and summarily remanded to this court for consideration on the merits.

executives, Elizabeth McGee and Shefali Kothari, alleging retaliatory discharge, hostile work environment, disability discrimination, and failure to accommodate. The National Employment Lawyers Association of New Jersey (NELA) was granted leave to appear as amicus curiae. For the reasons that follow, we reverse and remand.

I.

We discern the following facts from the face of plaintiff's complaint, giving plaintiff the benefit of all reasonable factual inferences. See Darakjian v. Hanna, 366 N.J. Super. 238, 248 (App. Div. 2004) ("[T]he facts as pleaded must be taken to be true for the purposes of the motion [to dismiss for failure to state a claim] . . . .").

Background

Plaintiff was hired by Novartis on May 1, 2018, as an "Ethics, Risk, and Compliance Advisor" in their "U.S. Patient Support Services (PSS) and Managed Markets" division. Plaintiff, an attorney, had over twenty years of compliance experience. Novartis Pharmaceuticals Corporation is a subsidiary of Novartis International AG, a Swiss multinational pharmaceutical corporation based in Basel, Switzerland. Prior to plaintiff's employment, Novartis had entered into a settlement with the U.S. Department of Justice (DOJ) to resolve

3

claims of historical unlawful pharmaceutical practices. As part of the settlement, Novartis signed a Corporate Integrity Agreement (CIA) under which the Office of Inspector General (OIG) would continue to monitor Novartis's conduct for compliance.

As part of her employment, plaintiff was assigned to four "leadership teams" at Novartis: Managed Markets; PSS; Ethics and Compliance; and U.S. Pharma. In the course of her employment, plaintiff identified potential violations in three areas: Novartis's "Cardiac Nurse" program; a training slide deck entitled "Sales Guidance on Interactions with Pharmacies"; and inadequacies in compliance review associated with Novartis's acquisition of ophthalmic drug "Xiidra" (the "Pillpack Agreement"). In her complaint, plaintiff alleged expressing her objections in these areas caused her to be subjected to retaliation that continued until her termination.

<u>Cardiac Nurse Program</u>

Shortly after plaintiff's employment began, she identified the Cardiac Nurse program as a potential violation of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b. The complaint described the Cardiac Nurse program as follows:

> Novartis hired licensed cardiac nurses to visit cardiac patients that had been prescribed [heart failure

4

medication] Entresto and report back to the prescribing cardiologists, free of charge. As a result, physicians prescribing Entresto were receiving free cardiac nursing services which were paid for by Novartis, providing an illegal incentive for physicians to prescribe Entresto.

Kothari, who was Novartis's Vice President of Legal and, at the time, reported directly to McGee, Novartis's U.S. General Counsel, "approved" the program for the PSS group.

On July 2, 2018, plaintiff emailed her manager, U.S. Chief Compliance Officer Bryant Aaron, notifying him of her findings. Later that month, plaintiff met with Aaron and requested guidance "on how to end or reform" the Cardiac Nurse program. Aaron assured her he would speak to Kothari and McGee about her concerns. When Aaron failed to follow-up, plaintiff told him she would speak to Kothari herself.

After plaintiff spoke to Kothari, Kothari became "defensive" and "claim[ed] that she had not worked on the program." Plaintiff alleged Kothari "was unable to articulate how the Cardiac Nurse [p]rogram could be compliant" with the relevant law, and refused to provide her with the program approval documents. Subsequently, Aaron, Kothari, McGee, and others "had a number of meetings about the Cardiac Nurse [p]rogram." Plaintiff was excluded from those meetings.

A-3481-24

Additionally, plaintiff "began to be excluded from other meetings and discussions that were material to her ability to perform her job," and plaintiff noticed "she was avoided and shunned by key managers and members of leadership," including McGee. When plaintiff confronted Aaron about the exclusions, and noted her concern that "her whistle[]blowing had damaged her career at Novartis," Aaron told her that many individuals were "pissed" because her concerns regarding the Cardiac Nurse program caused "people [to] have egg on their faces."

Later, Matt Zeller, the commercial head of the Cardiac Nurse program, met with plaintiff. At the meeting, Zeller "yelled and berated [plaintiff] in an outrageous manner, using profanity, to the point that his face turned red and a vein was bulging in his forehead." Zeller told plaintiff he had heard "[she was] trying to shut down the program" and asked, "[H]ow dare you?" Plaintiff was "extremely shaken and distressed following th[e] meeting" and "began to fear that her career was in danger."

After the meeting, Kothari announced the Cardiac Nurse program would be terminated, citing "changes in the current government enforcement environment." Shortly after the announcement, plaintiff was moved from the position of "Compliance Advisor for PSS and Managed Markets" to a role

"support[ing] the Ophthalmology Franchise's legacy products," a transfer plaintiff believed was retaliatory. Plaintiff alleged the "department and company" had to be "rearrange[d]" in order for plaintiff to be moved. After the reassignment, plaintiff notified Aaron she believed this was "punish[ment] for identifying the non-compliant Cardiac Nurse [p]rogram."

<u>"Sales Guidance on Interactions with Pharmacies" Slide Deck</u>

Around May 2019, in her new role, plaintiff reviewed a slide deck prepared by the Ophthalmology Marketing team entitled "Sales Guidance on Interactions with Pharmacies." The slide deck was used to train Novartis's sales employees. As part of her review, plaintiff redlined certain materials she believed were regulatory violations. Plaintiff also "opposed a recommendation by the legal department to rename the document by omitting the word 'Sales' so that the non-compliant slide deck would not be identified in response to DOJ/OIG investigation or subpoena."

On June 5, 2019, plaintiff was called into a meeting with McGee, Aaron, and Jennifer DeStefano, a member of Novartis's legal team who had reviewed the slide deck. McGee "forcefully reprimanded" plaintiff for "speaking up" and "'questioning' the advice of the [l]egal [d]epartment," and was directed to "leave the legal decision[s] to [the legal department]." When plaintiff "asked for

examples of any alleged misconduct," McGee "specifically identified [plaintiff's] prior whistleblowing with respect to the Cardiac Nurse [p]rogram." McGee then "demanded that [plaintiff] apologize" to DeStefano, "for questioning [DeStefano's] slides." Plaintiff complied out of fear of further retaliation. After the meeting, plaintiff raised her concerns to Aaron that McGee was creating a "toxic culture" where no one "can speak up." Aaron agreed.

Xiidra Acquisition and the Pillpack Agreement

As part of her job, plaintiff "successfully led" Novartis's "acquisition, integration, and launch" of ophthalmic drug, Xiidra, an estimated $1.2 billion product. The acquisition, which occurred on July 1, 2019, was not contemplated at the time of her transfer. Plaintiff "led a team of nine . . . [c]ompliance workstreams with over thirty . . . associates" and was "so integral to [the] success [of the acquisition]" that Aaron requested plaintiff "cancel[] her pre-planned family vacation" to complete the closing. The Xiidra Acquisition U.S. Project Lead also emailed Aaron praising plaintiff for her work on the acquisition.

During the closing process, plaintiff spoke up regarding concerns she had about the acquisition. Specifically, on June 5, 2019, three weeks prior to the closing, plaintiff became aware that PSS had failed "to conduct and initiate due diligence" by reviewing numerous programs and third-party contracts to be

8

acquired by Novartis, jeopardizing the anticipated closing date. On June 13, 2019, in an "urgent internal meeting" attended by plaintiff, PSS leadership advised they "would not review the third-party contracts and those contracts would be duly assigned to Novartis at closing without review." Plaintiff and others disagreed with the decision and stressed that the contracts should be reviewed, but the advice was ignored.

On June 18, 2019, plaintiff expressed concerns about a specific Xiidra program, the Pillpack Agreement. The Pillpack Agreement was a "Home-Delivery/Mail-Order Pharmacy program" plaintiff believed "contained illegal discount arrangements, kickback, patient steering[,] and . . . other illegalities." After plaintiff raised her concerns, she participated in a June 24, 2019 meeting to discuss the Pillpack Agreement, but was "excluded . . . from further [related] internal meetings." In the June 24, 2019 meeting, attended by Kothari and others, plaintiff objected to the illegal agreement.

The following day, June 25, 2019, after being notified that Novartis planned to go forward with the Pillpack Agreement, plaintiff emailed her objections directly to Novartis's legal counsel. Plaintiff requested the illegal agreement "be removed from the assigned contracts list." On June 26, 2019, Kothari removed the Pillpack Agreement from the Xiidra acquisition.

 A-3481-24

<u>Bogus Investigations and Other Retaliatory Acts</u>

The next day, June 27, 2019, Aaron told plaintiff she was being investigated by Human Resources (HR) based on her "behavior during the June 13, 2019 meeting"[2] in connection with the Xiidra acquisition. In the June 13, 2019 meeting, plaintiff had first raised concerns about the failure to perform due diligence on the to-be-acquired contracts. The investigation was led by Pedro Menendez-Manjon, "HR business partner for Ethics & Compliance." Plaintiff told Aaron she believed the investigation was an act of retaliation. On July 23, 2019, Menendez-Manjon reported his investigation revealed no misconduct by plaintiff.

On September 5, 2019, Aaron conducted plaintiff's midyear performance review, during which she was praised for the Xiidra acquisition and was not told of any performance deficiencies. A day later, on September 6, 2019, plaintiff met with Patrick Mooney, Novartis's Vice President. Mooney told plaintiff McGee had "issues" with her "because [plaintiff] had identified and objected to various illegal actions." Although he acknowledged he had defended plaintiff against McGee "during heated discussions," Mooney warned plaintiff that

---

[2] Initially, Aaron told plaintiff the investigation was based on complaints by "PSS and others in the [l]egal [d]epartment." However, once plaintiff was cleared of wrongdoing, Aaron admitted McGee had instigated the investigation.

A-3481-24

McGee had "powerful friends at Novartis." He also told plaintiff to "be careful" because McGee and Kothari were "still angry" over her objection to the Cardiac Nurse program. The meeting left plaintiff feeling "extremely distress[ed]."

Around October 2, 2019, plaintiff learned a colleague was assigned to make a presentation about the Xiidra acquisition at the Ethics, Risk, Compliance Forum at Novartis's global headquarters in Switzerland. Plaintiff described the assignment as "a significant honor with important career and promotional implications." Plaintiff was "extremely upset and humiliated" at not being chosen as she had led the project, not her colleague. Plaintiff believed she was purposely "excluded from the speaking engagement" because of her prior whistleblowing. When plaintiff protested the exclusion with Aaron, he assured her he would "take care of her" by giving her a "3.3, or 'Exceeds Expectations'" on her upcoming 2019 year-end performance review.

Around the same time, in early October 2019, Menendez-Manjon told plaintiff she was subject to yet another HR investigation, arising out of her comments during a "meeting/telephone conference with the [l]egal and [b]usiness [d]epartments." Plaintiff later discovered she was reported by McGee for using the word "handcuff" during the conference call. Plaintiff was again cleared of any misconduct.

11

Several months later, on February 3, 2020, plaintiff again discussed her upcoming 2019 year-end performance review with Aaron. Once again, Aaron assured her she had done a "great job" and did not raise any performance deficiencies with her. About a week later, on February 12, 2020, plaintiff was called into an urgent telephonic meeting by DeStefano. During the call, plaintiff was "questioned . . . in an accusatory tone" about approving a "sample portal" project that allegedly allowed providers "to obtain product samples of prescription drugs through an on[]line channel." In other words, plaintiff was being accused of approving "an illegal kickback." Plaintiff stated "she would investigate and report back," as she was unaware of the program.

Plaintiff's investigation revealed the project was fully compliant with all rules and regulations. On February 18, 2020, plaintiff scheduled an in-person meeting with the relevant teams to "address and allay" DeStefano's concerns about the sample portal. "During the meeting, the teams outlined the entire sample portal process and controls" so DeStefano could "learn the process and put to rest any compliance concerns."

Two days later, on February 20, 2020, plaintiff had a telephone call with DeStefano and others "to discuss how the teams could better collaborate in the future." During the call, DeStefano admitted approving the sample portal

project "without fully understanding the compliance criteria for its operations," was "defensive and argumentative," and "never apologized" to plaintiff for "falsely accusing her . . . of approving an illegal kickback program." Plaintiff later told Aaron about the sample portal issue, "not[ing] that the sample portal had almost been shut down because . . . DeStefano[] did not understand the compliance issues," "incorrectly concluded the sample portal" was illegal, and "erroneously blamed her" for approving it.

Subsequently, on February 24, 2020, Aaron conducted plaintiff's 2019 year-end performance review. Contrary to her expectations, plaintiff was rated "2.2, or 'Meets Expectations.'" Aaron advised plaintiff the low score resulted from plaintiff's failure to "'collaborate' with her peers." However, plaintiff averred "360 peer reviews reflected that [plaintiff] had received the highest ratings from her peers for collaboration and leadership." Aaron later revealed to plaintiff that McGee "was behind giving [plaintiff] a low rating." Plaintiff appealed the low score, noting in her appeal she believed the rating "was an act of retaliation against her for having objected to various illegalities she observed during 2019."

The day before her performance review, on February 23, 2020, Novartis's Business Practice Office, also known as Novartis's Speak Up Office and

"whistleblowing hotline," received a complaint about plaintiff's department regarding the sample portal project. The complainant, Executive Director of Novartis People & Organization David Britt, "who support[ed] . . . McGee and her legal team," alleged he learned of an ongoing illegal kickback program approved by someone in plaintiff's department.

Initially, the complaint was assigned to plaintiff to investigate, as this was part of her role and "Novartis policy." As part of her investigation, plaintiff called Britt to interview him about the complaint. However, Britt was "nervous" and refused to provide information, claiming an unexplained "conflict of interest." About fifteen minutes after the call, plaintiff received an email from the Head of Compliance Investigations, Christine Rzasa, informing her the complaint was reassigned to another associate, contrary to Novartis policy. Plaintiff responded by bringing to Rzasa's attention the fact that she had been excluded from a meeting attended by Aaron, Britt, and DeStefano regarding the sample portal project that resulted in the complaint. Although Rzasa assured plaintiff she would be contacted during the investigation, plaintiff was never contacted.

In a March 12, 2020 meeting, Aaron and Menendez-Manjon presented plaintiff with a "'final warning' Conduct Memo." A "'final warning' Conduct

14

Memo" was a "serious personnel action . . . only undertaken after prior incidents of discipline and with advance notice and an opportunity to address any alleged wrong[]doing." The memo, dated March 6, 2020, "noted it was [plaintiff's] 'final warning' before termination" and "was riddled with false allegations such as blaming [plaintiff] for the sample portal issue." During the meeting, plaintiff asked whether Compliance Rotation Associate Shawn Laverty, who had been present during all sample portal meetings, had been interviewed. Menendez-Manjon became "very angry and defensive" and "refused to permit [plaintiff] to call . . . Laverty." Plaintiff advised Aaron and Menendez-Manjon she believed "the Conduct Memo was yet another act of retaliation."

Thereafter, on April 14, 2020, plaintiff reported the perceived retaliation, including the Conduct Memo, to Victor Bulto, President of U.S. Pharmaceuticals. Bulto advised plaintiff he would investigate and "get back to her." A week later, he "sent [her] an email dismissing her retaliation claims."

<u>Plaintiff's Cancer Diagnosis, Medical Leave, and Termination</u>

About two months later, in June 2020, after providing documents to support her appeal of her 2019 year-end performance review, plaintiff "experienced a seizure" and was diagnosed with "brain cancer." She underwent intensive chemotherapy treatments. Eight months later, she "was diagnosed

15

with ocular cancer" and continued chemotherapy with her husband, Greg Campbell, as her primary caretaker. As a result of her cancer treatment, plaintiff was out of work for several months on medical leave.[3]

According to the complaint, Novartis consistently interfered with plaintiff's medical leave, which had been approved through November 2021. Although Menendez-Manjon and Novartis HR Benefits Manager Debra Bloodgood agreed to coordinate plaintiff's return-to-work arrangements and accommodations, plaintiff received no further information on her requested accommodations. Instead, plaintiff received a letter from Novartis "notifying her that her employment would be terminated if she did not return to work by June 1, 2021," not November 2021 as previously communicated.

When Campbell emailed Menendez-Manjon, expressing his confusion and shock at the letter, Menendez-Manjon responded on May 6, 2021, directing that all further communications between plaintiff and Novartis be in writing. Menendez-Manjon also provided plaintiff with medical questionnaires to be completed within nine business days. The completed medical questionnaires were returned on May 20, 2021, clearing plaintiff to return to work on June 1,

---

[3] During this period, Novartis settled additional claims of illegal kickbacks to physicians with the DOJ and entered into yet another CIA with the OIG.

2021, with the following accommodations: "remote working; reduced schedule; ramp-up period; supplemental breaks; [and] supplemental equipment (home-work station with monitor, computer, [and] printer)."

Because plaintiff "received no information from Novartis about her return to work or her workplace accommodations" by June 1, 2021, she did not return that day. Three days later, on June 4, a Novartis HR associate emailed plaintiff, stating "her medical leave had been extended to August 30, 2021." "The email provided no further explanation" or "information about [plaintiff's] return-to-work accommodations."

On June 7, 2021, plaintiff filed a complaint with Novartis's Speak Up Office. Plaintiff alleged retaliation and discrimination because of her disability and specifically identified McGee, Aaron, and Menendez-Manjon "as individuals who were discriminating and/or retaliating against her."

Ten days later, on July 17, 2021, plaintiff, Campbell, Menendez-Manjon, and "HR business partner for Ethics and Compliance" Yatin Nayampally, participated in a call regarding plaintiff's medical leave. Plaintiff and Campbell were notified they were not required to submit a medical questionnaire for July as it was duplicative of the May questionnaire previously submitted. Two days later, on July 19, 2021, Nayampally emailed Campbell notifying him that

17

plaintiff was, in fact, required to complete the July questionnaire. Campbell submitted the July questionnaire a month later, on August 19, 2021, requesting the same accommodations as the May questionnaire.

Despite repeated attempts to communicate with Novartis regarding plaintiff's accommodations, Novartis "failed to commit to provide the requested accommodations" until September 1, 2021. That day, plaintiff was notified her return-to-work date was September 7, 2021. She was also notified she would no longer be reporting to Aaron, but to Michael Ace, Novartis's Executive Director of Policy. Although she learned Aaron had left Novartis, plaintiff characterized this new reporting structure as a de facto demotion. Plaintiff also learned Kothari had been "promoted" to Chief Compliance Officer as of March 2021.

Plaintiff returned to work without the requested accommodations. Several weeks later, on October 10, 2021, plaintiff informed Ace that Novartis "was not providing her with her requested accommodations" and she was "being retaliated against for her whistleblowing activities prior to her medical leave." Ace claimed he "knew nothing about any accommodations," except for plaintiff's need for a larger computer monitor. Despite plaintiff's communications with Ace and Nayampally over the next two days to address her requested

18

accommodations, "[n]either . . . Ace nor . . . Nayampally responded to [plaintiff's] request."

On October 12, 2021, Maria LaRosa, Global Head of Novartis's Speak Up Office, contacted plaintiff regarding her complaint and scheduled a meeting with outside counsel. LaRosa was "very insistent" that plaintiff meet with outside counsel "the very next day," October 13, 2021. Plaintiff believed "Novartis was anxious to 'close out' [plaintiff's] complaint[] prior to her planned termination." On October 14, 2021, Kothari invited plaintiff to a meeting on October 19, 2021, "allegedly to 'catch-up' with" plaintiff. On October 19, 2021, "Kothari advised [plaintiff], by email, that her employment was being terminated allegedly as a result of the elimination of her position."

<u>Plaintiff's Lawsuit</u>

On August 8, 2022, plaintiff informed defendants of her intent to file suit. In order to engage in pre-suit discussions, the parties entered into a tolling agreement that paused the statute of limitations on August 8, 2022. Defendants later cancelled the agreement pursuant to the cancellation provision in the agreement, and, as such, the agreement ended May 31, 2023.

In her complaint, initially filed May 31, 2023, plaintiff alleged ten counts based on CEPA and the NJLAD. Plaintiff alleged: retaliation under CEPA

(count one); hostile work environment under CEPA (count two); disability discrimination under the NJLAD (count three); retaliation under the NJLAD (count four); failure to accommodate under the NJLAD (count five); and hostile work environment under the NJLAD (count six). Plaintiff alleged aiding and abetting in violation of the NJLAD as to McGee and Kothari, respectively (counts seven and eight); and individual liability under CEPA as to McGee and Kothari, respectively (counts nine and ten). Plaintiff subsequently filed an amended complaint, adding aiding and abetting as to Novartis AG in violation of the NJLAD (count eleven); and liability as to Novartis AG under CEPA (count twelve).

In count one, plaintiff alleged she engaged in protected activity by disclosing and objecting to conduct "she reasonably believed was in violation of a law, rule or regulation, and/or which conduct was fraudulent, deceptive and/or criminal," including the "Cardiac Nurse [p]rogram, 'Sales Guidance on Interactions with Pharmacies' slide deck, and Xiidra Pillpack Agreement."

The complaint continued:

> [d]efendants retaliated against [p]laintiff by, among other things: subjecting her to bogus internal investigations; falsely criticizing her performance; isolating and marginalizing her; berating and humiliating her; transferring her to less desirable roles; prohibiting her from serving on leadership teams;

20

preventing her from presenting on a project she had spearheaded; giving her a poor 2019 Year-End Performance Evaluation; obstructing her ability to return to work after her leave; failing and refusing to provide her with reasonable accommodations to return to work once she was disabled; and ultimately terminating her employment.

In count two, plaintiff alleged she "was subjected to a hostile work environment by [d]efendants on the basis of her whistleblowing activities." The complaint alleged "[d]efendants' unwelcome conduct" was "severe and pervasive enough to change the conditions of her employment" and created a "working environment [that] was intimidating, hostile[,] and abusive."

Defendants moved to dismiss pursuant to Rule 4:6-2(e),[4] contending plaintiff's CEPA claims were barred by CEPA's one-year statute of limitations. See N.J.S.A. 34:19-5. After conducting oral argument, the motion judge entered an order on January 3, 2025, granting defendants' motion in part. The January 3 order dismissed all five CEPA claims against all defendants with prejudice (counts one, two, nine, ten, and twelve).

In an oral decision on the record, the judge ruled the acts of retaliation underlying the claims were discrete acts that occurred more than a year prior to

---

[4] Prior to filing the motion, defendants unsuccessfully attempted to remove the action to federal court.

A-3481-24

August 8, 2022, the date fixed for statute of limitations purposes under the tolling agreement. As such, they could not be aggregated to toll the statute of limitations under a continuing violations theory and were therefore untimely. In her ruling, the judge recounted plaintiff's whistleblowing activities as alleged in her complaint "relating to the [C]ardiac [N]urse program, the ophthalmology slide deck, and the [Pillpack Agreement]," as all occurring between 2018 and 2019. The judge also delineated the alleged retaliatory acts committed by defendants.

The judge continued,

> Although each of those claims are based on conduct that occurred in 2018 and 2019, plaintiff asserts that the statute of limitations does not bar her claims because plaintiff's claims did not accrue until the termination of her employment on October 19, 2021, which is after the date fixed in the tolling agreement governing the statute of limitations. That is the conduct giving rise to a cognizable CEPA claim accrued after August 8, 2021.
>
> Essentially, plaintiff asserts that the continuing violation theory applies and therefore the CEPA claims did not accrue until the last act occurred, which plaintiff asserts was the termination of her employment.

In rejecting plaintiff's contention, the judge explained:

> Arguably, plaintiff knew or should have known that the continued retaliatory actions relating to her protected conduct provided a basis for discrete claims

22

relating to the ophthalmology slide deck and [Pillpack Agreement], which would have required the filing of complaints on or before October 21, 2019.

Even if, however, the [c]ourt considered plaintiff's claims relating to the [C]ardiac [Nurse] program, the ophthalmology slide deck, and the [Pillpack Agreement] under the continuing violation theory, . . . the statute of limitations would still bar those claims.

The judge expounded:

Plaintiff alleges that from 2018 and through 2019 she continued to experience retaliation relating to the whistleblowing conduct concerning the [C]ardiac [Nurse] program. Plaintiff alleged that she also suffered retaliation for alleged whistleblowing actions concerning the ophthalmology slide deck and [Pillpack Agreement].

Like the retaliatory conduct allegedly relating to the [C]ardiac [Nurse] program, the retaliation relating to the exclusions from meetings, prohibitions on making . . . a presentation on a significant product launch may not have been sufficiently egregious alone to file a CEPA claim.

When, however, in September 2019[,] plaintiff was warned that management continued to be angry with plaintiff about expressing objections to those programs, accused plaintiff wrongly of approving an illegal program, and on February 24, 2020[,] issued a substandard performance evaluation relating to plaintiff's work in 2019 requiring an appeal, and issued a conduct memo on March 6, 2020[,] advising plaintiff it was a "final warning" before the termination of plaintiff's employment, plaintiff knew or should have

23

known that she had a cognizable claim under CEPA based on a sufficiently egregious adverse employment action.

Accordingly, . . . any claim for those CEPA violations had to be filed within a year of that date or by no later than March 6, 2021. Having failed to file by that date, plaintiff's CEPA . . . claims cannot be revived based on any alleged discriminatory action occurring thereafter.

Plaintiff moved for reconsideration, which was denied in a February 14, 2025 order. Citing Lawson v. Dewar, 468 N.J. Super. 128, 134 (App. Div. 2021), the order noted "[p]laintiff simply disagrees with the court's conclusion" and "has not demonstrated that the interests of justice warrant reconsideration."

On appeal, plaintiff argues the judge's dismissal of her CEPA claims was incorrect as a matter of law as plaintiff's wrongful termination claim began to accrue on the date of her termination "regardless of prior or subsequent acts of retaliation," and her hostile work environment claim accrued at "the cessation of [d]efendants' [retaliatory] conduct," which was "no earlier than September-October 2021 and remained viable when the statute of limitations was tolled on August 8, 2022." Plaintiff asserts "[e]ven if the [c]ourt were to identify a pleading gap in chronology or detail, the remedy is leave to amend, not dismissal with prejudice." NELA agrees with plaintiff, arguing a retaliatory termination claim begins to accrue on the date of termination as a matter of law. Defendants

counter the judge correctly dismissed the CEPA claims as time-barred.[5]

## II.

Our review of a dismissal for failure to state a claim pursuant to Rule 4:6-2(e) "is plenary and we owe no deference to the trial judge's conclusions." State v. Cherry Hill Mitsubishi, Inc., 439 N.J. Super. 462, 467 (App. Div. 2015). "The inquiry is limited to 'examining the legal sufficiency of the facts alleged on the face of the complaint,'" ibid. (quoting Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)), "giving the plaintiff the benefit of 'every reasonable inference of fact,'" Baskin v. P.C. Richard & Son, LLC, 246 N.J. 157, 171 (2021) (quoting Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 107 (2019)).

Such motions "require the complaint be searched in depth and with liberality to determine if there is any 'cause of action . . . suggested by the facts,'" Cherry Hill Mitsubishi, 439 N.J. Super. at 467 (quoting Printing Mart-Morristown, 116 N.J. at 746) (internal quotation marks omitted), and "to

---

[5] Defendants also argue plaintiff's claims should be dismissed for lack of causation. The judge did not decide the motion on causation grounds. Considering the "generous reading of the allegations" a plaintiff is afforded at the motion to dismiss stage in the litigation, defendants' causation theory provides no basis to affirm the dismissal on the pleadings. Kieffer v. High Point Ins. Co., 422 N.J. Super. 38, 43 (App. Div. 2011) (quoting Edwards v. Prudential Prop. & Cas. Co., 357 N.J. Super. 196, 202 (App. Div. 2003)).

ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary," Printing Mart-Morristown, 116 N.J. at 746 (quoting Di Cristofaro v. Laurel Grove Mem'l Park, 43 N.J. Super. 244, 252 (App. Div. 1957)); see Rieder v. State, 221 N.J. Super. 547, 552 (App. Div. 1987) ("A complaint should not be dismissed under this rule where a cause of action is suggested by the facts and a theory of actionability may be articulated by way of amendment.").

At this preliminary stage of the litigation, courts are not concerned with a plaintiff's ability to prove the allegations in the complaint. Printing Mart-Morristown, 116 N.J. at 746. Only where "a generous reading of the allegations does not reveal a legal basis for recovery" should the motion be granted, Kieffer, 422 N.J. Super. at 43 (quoting Edwards, 357 N.J. Super. at 202), and generally "without prejudice to a plaintiff's filing of an amended complaint," Printing Mart-Morristown, 116 N.J. at 772.

Nonetheless, a complaint should be dismissed if it "states no claim that supports relief, and discovery will not give rise to such a claim." Dimitrakopoulos, 237 N.J. at 107. Indeed, "the essential facts supporting [the] plaintiff's cause of action must be presented in order for the claim to survive" and "conclusory allegations are insufficient in that regard." Scheidt v. DRS

Techs., Inc., 424 N.J. Super. 188, 193 (App. Div. 2012). Thus, "a dismissal is mandated where the factual allegations are palpably insufficient to support a claim upon which relief can be granted." Rieder, 221 N.J. Super. at 552.

Similarly, if a claim faces an "impediment such as a statute of limitations," a dismissal with prejudice is proper. Printing Mart-Morristown, 116 N.J. at 772; see Rappeport v. Flitcroft, 90 N.J. Super. 578, 580-81 (App. Div. 1966) ("[W]here the bar of the statute of limitations appears on the face of the complaint, it may be asserted as a failure to state a claim upon which relief can be granted." (internal quotation marks omitted)).

Turning to the cause of action at issue in this appeal, CEPA is remedial legislation designed "to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." Sauter v. Colts Neck Volunteer Fire Co. No. 2, 451 N.J. Super. 581, 588 (App. Div. 2017) (quoting Mehlman v. Mobil Oil Corp., 153 N.J. 163, 179 (1998)). Accordingly, the statute "shields an employee who objects to, or reports, employer conduct that the employee reasonably believes to contravene the legal and ethical standards that govern the employer's activities." Hitesman v. Bridgeway, Inc., 218 N.J. 8, 27 (2014); see N.J.S.A. 34:19-3(a), (c).

To that end, the statute prohibits an employer from retaliating "against an employee who discloses, threatens to disclose, or refuses to participate in an activity of the employer 'that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law.'" Sauter, 451 N.J. Super. at 587 (quoting N.J.S.A. 34:19-3). In determining the sufficiency of a plaintiff's pleading, CEPA does not require that the activity complained of actually violates a law or regulation, only that the employee has a reasonable belief that such is the case. Dzwonar v. McDevitt, 177 N.J. 451, 464 (2003).

To establish a prima facie case of unlawful retaliation under CEPA, a plaintiff must establish:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;
>
> (2) he or she performed a "whistle[]blowing" activity described in N.J.S.A. 34:19-3(c);
>
> (3) an adverse employment action was taken against him or her; and
>
> (4) a causal connection exists between the whistle[]blowing activity and the adverse employment action.
>
> [Lippman v. Ethicon, Inc., 222 N.J. 362, 380 (2015) (quoting Dzwonar, 177 N.J. at 462).]

CEPA defines actionable retaliation as "the discharge, suspension[,] or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e). As such, "the universe of possible retaliatory actions under CEPA is greater than discharge, suspension, and demotion," as evidenced by the statute's express inclusion of "other adverse employment action taken against an employee in the terms and conditions of employment." Donelson v. DuPont Chambers Works, 206 N.J. 243, 257 (2011) (quoting N.J.S.A. 34:19-2(e)).

Ordinarily, a plaintiff has "one year" from the occurrence of the retaliatory act to file an action under CEPA. N.J.S.A. 34:19-5. Retaliatory acts can be a single discrete action, like discharge, or a hostile work environment claim, consisting of "many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct." Green v. Jersey City Bd. of Educ., 177 N.J. 434, 448 (2003).

Because "a discharge is a discrete discriminatory act that places an employee on notice of the existence of a cause of action and of the need to file a claim," the "statute of limitations begins to run on the day that act takes place." Roa v. Roa, 200 N.J. 555, 569 (2010) (citing Shepherd v. Hunterdon Dev. Ctr.,

174 N.J. 1, 19 (2002)); see Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110 (2002) (explaining a "discrete retaliatory or discriminatory act 'occur[s]' on the day that it 'happen[s]'").

In Shepherd, our Supreme Court adopted the Morgan Court's distinction between hostile work environment claims and discrete discriminatory acts:

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative [e]ffect of individual acts.
>
> . . . .
>
> In determining whether an actionable hostile work environment claim exists, we look to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." . . . A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice." . . . It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment

may be considered by a court for the purposes of determining liability.

That act need not, however, be the last act. As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has "occurred," even if it is still occurring. Subsequent events, however, may still be part of the one hostile work environment claim[,] and a charge may be filed at a later date and still encompass the whole.

[Shepherd, 174 N.J. at 19-20 (omissions in original) (quoting Morgan, 536 U.S. at 115-17).]

The primary issue presented to the Court in Shepherd was whether the plaintiffs' LAD claims were "barred by the two-year statute of limitations" or whether "an equitable exception to the statute of limitations known as the 'continuing violation' doctrine" applied. Id. at 6. Applying the Morgan Court's analytical framework, the Shepherd Court considered two questions:

First, have [the] plaintiffs alleged one or more discrete acts of discriminatory conduct by defendants? If yes, then their cause of action would have accrued on the day on which those individual acts occurred. Second, have [the] plaintiffs alleged a pattern or series of acts, any one of which may not be actionable as a discrete act, but when viewed cumulatively constitute a hostile work environment? If yes, then their cause of action would have accrued on the date on which the last act occurred, notwithstanding "that some of the component acts of the hostile work environment [have fallen] outside the statutory time period."

31

> [Id. at 21 (third alteration in original) (quoting Morgan, 536 U.S. at 117).]

The Court concluded, "[U]nder the continuing violation doctrine [the] plaintiffs' hostile work environment claims accrued" within the limitations period. Id. at 7.

In Green, our Supreme Court applied the continuing violation doctrine to CEPA claims, requiring "an inquiry into whether the 'plaintiff[] [had] alleged a pattern or series of acts, any one of which may not be actionable as a discrete act, but when viewed cumulatively constitute a hostile work environment.'" Green, 177 N.J. at 447 (quoting Shepherd, 174 N.J. at 21). If so, then the "[plaintiff's] cause of action accrued on the date on which the last act occurred, notwithstanding 'that some of the component acts of the hostile environment [were] outside the statutory time period.'" Ibid. (alterations in original) (quoting Shepherd, 174 N.J. at 21).

Stated differently, under the continuing violation doctrine, a "plaintiff may pursue a claim for discriminatory conduct if he or she can demonstrate that each asserted act by a defendant is part of a pattern and at least one of those acts occurred within the statutory limitations period." Shepherd, 174 N.J. at 6-7 (citing West v. Phila. Elec. Co., 45 F.3d 744, 754-55 (3d Cir. 1995)).

32

> [T]he continuing violation theory was developed to allow for the aggregation of acts, each of which, in itself, might not have alerted the employee of the existence of a claim, but which together show a pattern of discrimination. In those circumstances, the last act is said to sweep in otherwise untimely prior non-discrete acts.
>
> [Roa, 200 N.J. at 569.]

"[A] victim's knowledge of a claim is insufficient to start the limitations clock so long as the defendant continues the series of non-discrete acts on which the claim as a whole is based." Shepherd, 174 N.J. at 22. "Stated differently, knowledge of hostility and of ongoing acts consistent with that hostility in such a setting is insufficient to trigger the limitation timeframe . . . ." Alexander v. Seton Hall Univ., 204 N.J. 219, 230 (2010).

However, the continuing violation doctrine "does not permit . . . the aggregation of discrete discriminatory acts for the purpose of reviving an untimely act of discrimination that the victim knew or should have known was actionable. Each such 'discrete discriminatory act starts a new clock for filing charges alleging that act.'" Roa, 200 N.J. at 569-70 (quoting Morgan, 536 U.S. at 113). Because CEPA claims based on discrete acts of retaliation do not fall within the continuing violation doctrine like a hostile work environment claim,

33

they must be filed within one year of occurrence or else they are time-barred. Green, 177 N.J. at 446-47.

Applying these principles, for plaintiff's allegations to be timely, the alleged retaliation must have occurred either as a discrete retaliatory act occurring between August 8, 2021, and August 8, 2022, or as a series of separate acts that combine to make up a pattern of retaliatory conduct and at least one of those acts occurred between August 8, 2021 and August 8, 2022. See Alexander, 204 N.J. at 228 ("[While a] discrete retaliatory or discriminatory act occurs on the day that it happens, . . . when the complained-of conduct constitutes 'a series of separate acts that collectively constitute one unlawful employment practice[,]' the entire claim may be timely" if "the date on which the last component act occurred" is within the statute of limitations (quoting Roa, 200 N.J. at 567)).

Based on our de novo review, we are satisfied plaintiff's CEPA claim alleging retaliatory termination, a discrete retaliatory act, is timely. Plaintiff was discharged on October 19, 2021, squarely within the August 8, 2021, and August 8, 2022 limitations period. "[W]hen the employer's alleged conduct consists of wrongful termination, the employee's cause of action under CEPA accrues on the date of actual discharge." Alderiso v. Med. Ctr. of Ocean Cnty., 167 N.J. 191, 194 (2001); see Keelan v. Bell Commc'ns Rsch., 289

34

N.J. Super. 531, 540-41 (App. Div. 1996) (holding although [the] plaintiff "received written notification of [the] defendant's future intent to terminate his employment[,]" the plaintiff's cause of action under CEPA "accrued on the date of actual discharge").

Similarly, we are convinced that under the continuing violation doctrine, plaintiff's CEPA claim alleging a hostile work environment accrued within the limitations period. Plaintiff alleged a series of separate acts comprising a pattern of retaliatory conduct, including Novartis obstructing her return to work after her medical leave and mishandling her return-to-work accommodations request in September and October 2021, within the August 8, 2021, to August 8, 2022 limitations period. Under the circumstances, these last acts "sweep in otherwise untimely prior non-discrete acts." Roa, 200 N.J. at 569.[6]

Accordingly, we reverse the judge's January 3, 2025 order dismissing with prejudice plaintiff's five CEPA counts against Novartis, Kothari, and McGee, as

---

[6] We reject defendants' contention that plaintiff's hostile work environment claim fails because she did not plead "an unbroken pattern of retaliation." We discern no such bright line rule in New Jersey caselaw, and the federal cases upon which defendants rely are not precedential "under our State employment-law jurisprudence." Green, 177 N.J. at 446-47. "Although federal decisional law may serve to guide us in our resolution of New Jersey issues, 'we bear ultimate responsibility for the safe passage of our ship.'" Alderiso, 167 N.J. at 201 (quoting State v. Cooke, 163 N.J. 657, 670 (2000), overruled on other grounds by State v. Witt, 223 N.J. 409 (2015)).

well as the February 14, 2025 order denying plaintiff's motion for reconsideration. We remand for further proceedings, including the judge granting plaintiff leave to amend her complaint to plead with more specificity the series and chronology of non-discrete separate acts comprising the pattern of retaliatory conduct encompassing the hostile work environment claim.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division